NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

————————————————

Rockingham

Case No. 2024-0121

Citation: Contoocook Valley Sch. Dist. v. State, 2025 N.H. 29


CONTOOCOOK VALLEY SCHOOL DISTRICT & a.

v.

THE STATE OF NEW HAMPSHIRE & a.

Argued: December 10, 2024
Opinion Issued: July 1, 2025


Wadleigh, Starr & Peters, P.L.L.C., of Manchester (Michael J. Tierney and Elizabeth E. Ewing on the brief, and Michael J. Tierney orally), for the plaintiffs, and Steven A. Bolton, of Nashua, on the brief, for plaintiff Nashua School District.


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Anthony J. Galdieri and Samuel R.V. Garland, senior assistant attorney general, on the brief, and Anthony J. Galdieri orally), for the defendants.

Lehmann Major List, PLLC, of Concord (Richard J. Lehmann on the brief), for Senate President Jeb Bradley, as amicus curiae.

Rath, Young and Pignatelli, P.C., of Concord (William F. J. Ardinger on the brief), for Former Members of the Commission to Study School Funding (Representatives David Luneau, Mary Heath, Richard Ames, and Mel Myler), as amici curiae.

McLane Middleton, Professional Association, of Manchester (Michael A. Delaney and Amanda E. Quinlan on the brief), for the New Hampshire Charitable Foundation, as amicus curiae.

American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief), and National Education Association-New Hampshire, of Concord (Callan Sullivan and Lauren Snow Chadwick on the brief), as amici curiae.

John E. Tobin, Jr., of Concord, on the brief, Laflamme Law, PLLC, of Concord (Natalie Laflamme on the brief), Education Law Center, of Newark, New Jersey (Wendy Lecker on the brief), White & Case LLP, of New York, New York (Alice Tsier and Aditi Padmanabhan on the brief), 160 Law, PLLC, of Concord (Andru Volinsky on the brief), and Harter Secrest & Emery LLP, of Buffalo, New York (Michael-Anthony Jaoude on the brief), for Steven Rand, Robert Gabrielli, Jessica Wheeler Russell, Adam Russell, James Lewis, and John Lunn, Property Taxpayers and Plaintiffs in Rand v. State, 2025 N.H. 27, as amici curiae.

Gregory M. Sorg, of Franconia, on the memorandum of law, for Senators Timothy Lang and Howard Pearl; Speaker of the House Sherman Packard; and Representatives Keith Ammon, Harry H. Bean, José E. Cambrils, Glenn Cordelli, Jess Edwards, Keith Erf, Juliet Harvey-Bolia, Gregory Hill, William

2

Infantine, Jim Kofalt, Roderick M. Ladd, Jr., Wayne MacDonald, Carol McGuire, Dan McGuire, Jason Osborne, Kristine Perez, Katy Peternel, Andrew Renzullo, Alvin See, John Sellers, Vanessa Sheehan, Joe Sweeney, Chris True, Len Turcotte, Michael Vose, Scott Wallace, Thomas C. Walsh, Jr., and Kenneth L. Weyler, as amici curiae.

American Institute for Economic Research, of Great Barrington, Massachusetts (Jason Sorens, non-lawyer representative, on the brief), as amicus curiae.

BASSETT, J.

[¶1] The people of New Hampshire have, for centuries, been deeply committed to public education. See Claremont School Dist. v. Governor, 138 N.H. 183, 188-92 (1993) (Claremont I). That commitment is enshrined in the Encouragement of Literature Clause of the New Hampshire Constitution, which "declares that knowledge and learning spread through a community are 'essential to the preservation of a free government,' and that 'spreading the opportunities and advantages of education' is a means to the end of preserving a free, democratic State." Id. at 187 (quoting N.H. CONST. pt. II, art. 83). This appeal presents the issue as to whether the State has fulfilled its constitutional obligation, imposed by the Encouragement of Literature Clause, to determine the cost of, and sufficiently fund, the opportunity for a constitutionally adequate education for each educable child in New Hampshire. We agree with the trial court that it has not. However, we reverse the trial court's directive that the State immediately increase public school funding.

[¶2] The defendants, the State of New Hampshire, the New Hampshire Department of Education (DOE), the Governor, and the Commissioner of DOE (collectively, the State), appeal rulings of the Superior Court (Ruoff, J.) made on remand following our decision in Contoocook Valley School District v. State of New Hampshire, 174 N.H. 154 (2021) (ConVal I). The State challenges the trial court's rulings admitting the testimony of the plaintiffs' experts, declaring RSA 198:40-a, II(a) (Supp. 2024) unconstitutional on its face in violation of Part II, Article 83 of the State Constitution, granting injunctive relief, and awarding attorney's fees to the plaintiffs.[1] We affirm the trial court's expert admissibility

---

[1] The plaintiffs include eighteen New Hampshire school districts: Contoocook Valley, Winchester, Mascenic Regional, Monadnock Regional, Fall Mountain, Claremont, Newport, Hillsboro-Deering, Grantham, Oyster River Cooperative, Manchester, Windham, Derry Cooperative, Hill, Mascoma Valley Regional, Nashua, Lebanon, and Hopkinton. The plaintiffs also include two individuals:

rulings, its declaration that RSA 198:40-a, II(a) is facially unconstitutional, its determination of a conservative minimum threshold amount for base adequacy aid, and its award of reasonable attorney's fees to the plaintiffs, but we reverse its order that the State immediately make base adequacy aid payments of $7,356.01 per pupil.

I

[¶3] We begin by articulating the scope of this appeal. Over thirty years ago in Claremont I, 138 N.H. at 184, we held that Part II, Article 83 of the State Constitution "imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding." We have, time and again, reaffirmed our holding in Claremont I. See, e.g., Claremont School Dist. v. Governor, 142 N.H. 462, 473 (1997) (Claremont II) (holding that "the right to a State funded constitutionally adequate public education" is a "fundamental right"); Claremont School Dist. v. Governor (Accountability), 147 N.H. 499, 521 (2002) (observing that "[a]t no time has this court deviated from the holdings in Claremont I and Claremont II or their constitutional underpinnings"); ConVal I, 174 N.H. at 156 (citing Claremont I). To comply with the constitutional duty recognized in Claremont I, the State must "define an adequate education, determine the cost, fund it with constitutional taxes, and ensure its delivery through accountability." Londonderry Sch. Dist. v. State, 154 N.H. 153, 155-56 (2006) (Londonderry I) (quotation omitted).

[¶4] In this appeal, the State does not contest these longstanding legal principles, and it has waived any argument that we should overturn Claremont I and its progeny.[2] For their part, the plaintiffs do not challenge the definition of an adequate education set forth in RSA 193-E:2-a (Supp. 2024). Instead, this case concerns the State's obligation to "determine the cost" of a constitutionally adequate education and to "fund it." Id. at 155 (quotation omitted). Accordingly, this appeal presents three narrow questions: (1) whether

---

Richard Dunning, current member of the Contoocook Valley School Board, and Richard Cahoon, former vice chair of the Contoocook Valley School Board.

[2] The State expressly conceded during oral argument in ConVal I that it was not raising such a challenge. See State v. Robinson, 170 N.H. 52, 61 (2017) (explaining that the waiver doctrine "serves judicial economy by forcing parties to raise issues whose resolution might spare the court and parties later rounds of remands and appeals" (quotation omitted)). Moreover, in this appeal, the State has not sufficiently developed a stare decisis challenge to Claremont I and its progeny by addressing our four stare decisis factors. See Boyle v. City of Portsmouth, 172 N.H. 781, 787 (2020) (listing four factors and declining party's request that we revisit a prior ruling because party failed to address any of the factors); State v. Blackmer, 149 N.H. 47, 49 (2003) ("[W]e confine our review to only those issues that the defendant has fully briefed."). Indeed, at oral argument, counsel for the State explained that the State's "stare decisis" argument is, in fact, an argument that the trial court's approach rendered the issue presented nonjusticiable. We address justiciability separately below.

4

the trial court erred in ruling that the amount of funding provided by the State under RSA 198:40-a, II(a) is clearly and substantially insufficient to cover the cost of providing the opportunity for a constitutionally adequate public education as defined by RSA 193-E:2-a and guaranteed by Part II, Article 83 of the State Constitution; (2) if that funding is insufficient, whether the trial court erred in determining a conservative minimum threshold amount and in requiring the State to immediately provide funding in that amount; and (3) whether the trial court erred in awarding reasonable attorney's fees to the plaintiffs.

## A. Procedural Background and Legal Context

[¶5] Following our decision in Londonderry I, which held that a prior version of RSA 193-E:2, standing alone, did not fulfill the State's duty to define a constitutionally adequate education, see id. at 161, the legislature enacted RSA 193-E:2-a, see ConVal I, 174 N.H. at 157. RSA 193-E:2-a, I, provides:

(a) Beginning in the school year 2008-2009, and for each year thereafter, the specific criteria and substantive educational program that deliver the opportunity for an adequate education shall be defined and identified as the school approval standards in the following learning areas:

(1) English/language arts and reading.
(2) Mathematics.
(3) Science.
(4) Social studies, including civics, government, economics, geography, history, and Holocaust and genocide education.
(5) Arts education, including music and visual arts.
(6) World languages.
(7) Health and wellness education, including a policy for violations of RSA 126-K:8, I(a).
(8) Physical education.
(9) Engineering and technologies including technology applications.
(10) Personal finance literacy.
(11) Computer science.

(b) Teachers shall use academic and applied instruction to teach the learning areas under subparagraph (a). The following skills shall be integrated into the learning areas:

(1) Computer use and digital literacy.
(2) Logic and rhetoric.

This substantive educational program is designed for students in kindergarten through twelfth grade.  See RSA 193-E:2-a, II.

[¶6] RSA 198:40-a (Supp. 2024) sets forth the legislature's determination of the annual per pupil cost of providing the opportunity for an adequate education as defined in RSA 193-E:2-a.  The per pupil cost set forth in the statute, in turn, is used to calculate the total education grant for each municipality and the amount of funding to be appropriated by the legislature.  See RSA 198:41, I (Supp. 2024) (directing DOE to use the per pupil costs established in RSA 198:40-a to calculate municipalities' total education grants); RSA 198:42, II (Supp. 2024) (appropriating amount necessary to fund education grants made pursuant to RSA 198:41).  As of July 1, 2023, RSA 198:40-a, II defines that cost as follows based upon the average daily membership in residence (ADMR):

> (a) A cost of $4,100 per pupil in the ADMR, plus differentiated aid as follows:
> (b) An additional $2,300 for each pupil in the ADMR who is eligible for a free or reduced price meal anytime during the determination year; plus
> (c) An additional $800 for each pupil in the ADMR who is an English language learner anytime during the determination year; plus
> (d) An additional $2,100 for each pupil in the ADMR who is receiving special education services anytime during the determination year.

RSA 198:40-a, II; RSA 198:38, I-a (Supp. 2024) (defining ADMR).[3]  The statute provides that "[t]he sum total calculated under paragraph II shall be the cost of an adequate education."  RSA 198:40-a, III.  As in ConVal I, we will refer to the figure in RSA 198:40-a, II(a) as "base adequacy aid," ConVal I, 174 N.H. at 156, and, as the statute itself provides, to the amounts listed in subparagraphs (b) through (d) as "differentiated aid," RSA 198:40-a, II(a).

---

[3] The legislature has amended RSA 198:40-a twice during this litigation.  One amendment changed the basis for the per pupil calculations from the average daily membership in attendance (ADMA) to ADMR.  See Laws 2022, 175:4; RSA 198:38, I (Supp. 2024) (defining "[a]verage daily membership in attendance").  Another amendment increased the per pupil funding amounts in each subparagraph and eliminated a fourth differentiated aid category applicable to third grade students with certain below proficient reading test scores.  See Laws 2023, 79:150.

The version of the statute quoted in the text became effective on July 1, 2023 — after trial in this matter.  See Laws 2023, 79:150, :612; see also RSA 198:40-d, I (Supp. 2024) (providing for annual two percent increase in the per pupil costs in RSA 198:40-a, II).  Nevertheless, because the trial court relied upon the version of RSA 198:40-a in the text and the funding amounts reflected therein in its merits analysis and no party argues otherwise, we apply the above figures in our analysis.

6

[¶7] In March 2019, the plaintiffs filed a complaint asserting facial and as-applied constitutional challenges to RSA 198:40-a, II(a). They alleged that the amount of base adequacy aid is insufficient to cover the cost of providing the opportunity for an adequate education as guaranteed by Part II, Article 83 of the State Constitution and requested a declaratory judgment to that effect. Specifically, they alleged that the State underfunds certain components necessary for adequacy and provides no funding for others. The plaintiffs also requested an injunction barring the State from providing base adequacy aid in the amount specified in RSA 198:40-a, II(a).

[¶8] The trial court subsequently granted the plaintiffs' motion for summary judgment on the ground that RSA 198:40-a, II(a) is unconstitutional as applied to them and denied the State's cross-motion for summary judgment. See ConVal I, 174 N.H. at 160. On cross-appeals, we affirmed the trial court's denial of summary judgment to the State, and we reversed the trial court's grant of summary judgment to the plaintiffs. See id. at 156. We concluded that entry of summary judgment for either party was inappropriate given that "determining the components of an adequate education and their costs presents a mixed question of law and fact" and that the parties "vigorously disputed" the underlying facts. Id. at 166-67.

[¶9] On remand, the parties again filed cross-motions for summary judgment, both of which the trial court denied. In doing so, the trial court rejected the State's legal argument that, in evaluating the plaintiffs' constitutional challenge, the court must consider all the funds provided pursuant to RSA 198:40-a, II — base adequacy aid and differentiated aid. The trial court also ruled on the parties' motions in limine, denying the State's motions to exclude the plaintiffs' experts.

[¶10] Following a three-week bench trial, the trial court issued a detailed and comprehensive order on the merits. The trial court performed the fact-finding and analysis that we outlined in ConVal I: it determined the components necessary to deliver an adequate education as defined by RSA 193-E:2-a and their costs. See id. It first identified the "cost-drivers that are essential to educating students in the content areas set forth in RSA 193-E:2-a": teachers, certain non-teacher staff (principals, administrative assistants, guidance counselors, library and media specialists, technology coordinators, custodians, and nurses), instructional materials, technology, professional development, transportation, and facilities operation and maintenance. It then determined the cost of funding only a subset of those components — teachers, non-teacher staff, instructional materials, and technology — to reach a figure of $4,752.34 per pupil (declaratory judgment calculation). The trial court compared this per pupil figure to the $4,100 per pupil provided in RSA 198:40-a, II(a) — consistent with its summary judgment ruling as to the scope of the plaintiffs' challenge — and concluded that the plaintiffs had provided sufficient evidence to meet their initial burden of proving "a clear and substantial conflict

between the current level of base adequacy aid funding and the amount necessary to fulfill the State's constitutional obligations in all, or virtually all, of New Hampshire's school districts." (Quotations omitted.) The burden of proof then shifted to the State to justify the base adequacy aid funding level set forth in RSA 198:40-a, II(a) under the strict scrutiny standard. Because the trial court found the State failed to offer any affirmative evidence justifying the sufficiency of the current funding level, it granted the plaintiffs' request for a declaratory judgment that RSA 198:40-a, II(a) is facially unconstitutional.

[¶11] After considering "the history and significance" of the issue and addressing separation of powers concerns, the trial court granted in part and denied in part the plaintiffs' request for injunctive relief. It denied the plaintiffs' request that it "set a definitive level of base adequacy aid funding," and, instead, determined "a conservative minimum threshold such funding must exceed." To ascertain that threshold, the trial court performed a separate calculation (injunctive relief calculation): it added the costs of the components included in its declaratory judgment calculation to the costs of the other components necessary for adequacy (teacher professional development, transportation, and facilities operation and maintenance), to reach a total of $7,356.01. It explained that, because this figure was the product of "conservative choices and overcorrections," it was "far too low," and that base adequacy aid in that amount "would be constitutionally insufficient."

[¶12] Even though the trial court concluded this figure would be constitutionally insufficient, it found that this threshold amount struck "the appropriate balance between the competing interests involved." It therefore granted the plaintiffs' request for injunctive relief to the extent that it ruled that "base adequacy aid funding must exceed" the threshold of $7,356.01 per pupil. The trial court also granted the plaintiffs' request for reasonable attorney's fees.

[¶13] The State moved for reconsideration and for a stay of the order "until one full legislative cycle has passed post appeal." The trial court denied both motions and, in doing so, clarified its injunctive relief ruling in several respects. Importantly, it clarified that it was directing "the State to make base adequacy aid payments equal to the conservative $7,356.01 threshold set forth" in the merits order pending resolution of any appeal or further legislative action. The State filed an expedited motion in this court to stay the trial court's merits order and post-trial order pending the outcome of any appeal. We granted the motion. This appeal followed.

[¶14] On appeal, the State argues that the trial court relied upon a flawed analytical approach and unreliable expert testimony in reaching its conclusion that RSA 198:40-a, II(a) is facially unconstitutional. It further asserts that even under that flawed approach, the plaintiffs failed to provide sufficient evidence to establish a constitutional violation. As to the remedy, the State contends that the trial court's injunctive orders were not supported by the

8

record and violate the separation of powers doctrine. Finally, the State challenges the trial court's award of attorney's fees to the plaintiffs. We first set forth our standard of review for the central constitutional question and then address in turn the threshold legal issues, the merits of the constitutional claim, the injunctive orders, and the award of attorney's fees.

## B. Standard of Review

[¶15] The constitutionality of a statute is a question of law, which we review de novo. ConVal I, 174 N.H. at 161. In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds. Id. This presumption requires that we hold a statute to be constitutional unless a clear and substantial conflict exists between it and the constitution. Id. When doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality. Id. The party challenging a statute's constitutionality bears the burden of proof. Id.

[¶16] This appeal concerns the plaintiffs' facial constitutional challenge to RSA 198:40-a, II(a). "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." Huckins v. McSweeney, 166 N.H. 176, 179 (2014) (quotation omitted).

[¶17] In light of the above framework, in the trial court the plaintiffs bore the initial burden of proving that there is a clear and substantial conflict between RSA 198:40-a, II(a) and Part II, Article 83 of the State Constitution in all, or virtually all, of the statute's applications. After the trial court concluded that the plaintiffs had satisfied that significant initial burden, it shifted the burden of proof to the State to justify the statute under the strict scrutiny standard. See Akins v. Sec'y of State, 154 N.H. 67, 73 (2006) (setting out strict scrutiny standard). On appeal, neither the State nor the plaintiffs challenge this burden-shifting framework, and we also apply it. Cf. id. at 71-74 (concluding first that plaintiffs had proven that statute "place[d] a severe restriction" on the fundamental equal right to be elected before considering whether the State could establish that the law passed strict scrutiny); Claremont II, 142 N.H. at 474 (observing that, if school district offers something less than educational adequacy, we will examine governmental action or inaction under strict scrutiny standard).

## C. Threshold Legal Issues

[¶18] The State first argues that the trial court erred as a matter of law when it permitted the plaintiffs to challenge RSA 198:40-a, II(a) in isolation,

9

rather than challenging the total funding provided in RSA 198:40-a, II.[4]  The plaintiffs counter that this court already decided in ConVal I that they could challenge RSA 198:40-a, II(a) independently of subparagraphs II(b) through (d). We need not decide whether we conclusively resolved this question in the prior appeal because, even if we assume in the State's favor that we did not, we now conclude as a matter of law that the plaintiffs may challenge RSA 198:40-a, II(a) in isolation.

[¶19] This issue raises a question of statutory interpretation, which we review de novo.  See ConVal I, 174 N.H. at 163.  When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used.  Id. In construing a statute, we will neither consider what the legislature might have said, nor add words that it did not see fit to include.  Id.

[¶20] The State asserts that, because RSA 198:40-a, III provides that the "sum total calculated under paragraph II shall be the cost of an adequate education," the trial court erred when it limited its inquiry to whether base adequacy aid alone is sufficient to deliver the opportunity for an adequate education.  We disagree.  RSA 198:40-a, I, provides that "the annual cost of providing the opportunity for an adequate education as defined in RSA 193-E:2-a shall be as specified in paragraph II."  Paragraph II provides that such cost is $4,100 per pupil "plus differentiated aid" of "additional" amounts for each pupil who, at any time during the determination year, is eligible for a free or reduced price meal, is an English language learner, or receives special education services.  RSA 198:40-a, II.

[¶21] Reading this language in the context of the statute as a whole, we conclude that subparagraph II(a) is intended to state the cost of providing an adequate education as defined in RSA 193-E:2-a to a student who does not meet any of the eligibility criteria in subparagraphs II(b)-(d), while the amounts set forth in II(b)-(d) represent the cost of delivering additional services necessary to provide the opportunity for an adequate education to the student populations identified in those subparagraphs — students eligible for free or reduced price meals, students who are English language learners, and students receiving special education services.  See RSA 198:40-a.  This costing formula recognizes that, although there is a base cost for each and every student, some students require additional support to receive the opportunity for an adequate education.  As the trial court correctly recognized, considering whether the sum of base adequacy aid and differentiated aid is sufficient to

---

[4] The State raises a similar challenge to the trial court's denial of its cross-motion for summary judgment after remand, arguing that the court erred in ruling that the plaintiffs' isolated constitutional claim could proceed to trial.  We decline to entertain that argument, however, because the State has not briefed the preliminary question of whether a denial of summary judgment is reviewable on appeal when, as here, the case proceeds to the entry of final judgment after trial.  See O'Malley v. Little, 170 N.H. 272, 275 (2017).

provide an adequate education as defined in RSA 193-E:2-a "could improperly divert differentiated aid funds to other purposes," contrary to the plain language of RSA 198:40-a. Ultimately, the trial court recognized the distinct functions of base adequacy aid and differentiated aid as set forth in the statute: in assessing the plaintiffs' constitutional challenge to RSA 198:40-a, II(a), the trial court properly declined to consider differentiated aid funding and the "additional" costs attributable to providing an adequate education to the student populations identified in II(b)-(d) and, instead, focused solely on the cost of providing the opportunity for an adequate education to a student with no additional needs.[5]

[¶22] To the extent the State makes a broader argument that the trial court erred by not considering sources of funding originating in statutes other than RSA 198:40-a, we disagree. By its plain language, RSA 198:40-a governs "the annual cost of providing the opportunity for an adequate education as defined in RSA 193-E:2-a." RSA 198:40-a, I. The State has not persuaded us that the other statutes it relies upon provide funding directed to that specific purpose. See, e.g., RSA 198:40-f, I (Supp. 2024) (providing for extraordinary need grants "[i]n addition to aid for the cost of the opportunity for an adequate education"); RSA 198:41, I (governing determination of the "total education grant" for each municipality). In sum, we find no error in the scope of the trial court's constitutional inquiry.

[¶23] The State next argues that the trial court committed legal error when it failed to interpret RSA 193-E:2-a and associated regulations to determine as a matter of law which components fall within the scope of the statute and, instead, determined the components necessary for an adequate education as a matter of fact. It asserts that determining whether components, such as nurses or transportation, are necessary for delivering the opportunity for an adequate education is simply a matter of statutory and regulatory construction. The plaintiffs counter that this court already decided in ConVal I that answering this question requires a mixed factual and legal inquiry, not a purely legal one. The State responds that ConVal I did not endorse the trial court's approach. We agree with the plaintiffs.

---

[5] Moreover, even if the scope of the constitutional inquiry had been the total amount of funding provided under RSA 198:40-a, II, we are doubtful that the consideration of differentiated aid would have altered the conclusion that the State is providing insufficient funding. As the trial court observed, both the plaintiffs and the State introduced "substantial evidence" about differentiated aid at trial, notwithstanding the trial court's in limine ruling precluding admission of such evidence. Although the trial court's analysis focused on the sufficiency of base adequacy aid alone, it found that "many schools receive very little [differentiated] aid." The record supports that finding. Witnesses from fourteen of the plaintiff school districts testified that, in their districts, expenditures on the additional services for students qualifying for differentiated aid, see RSA 198:40-a, II(b)-(d), exceed the differentiated aid they receive from the State. In fact, several of those witnesses testified that the amount their districts spend on special education alone, see RSA 198:40-a, II(d), exceeds the total amount of differentiated aid received by the districts.

11

[¶24] The law of the case doctrine provides that "[q]uestions once decided on appeal to this court are not ordinarily reexamined in the same case upon a subsequent appeal." Saunders v. Town of Kingston, 160 N.H. 560, 566 (2010) (quotation omitted). Thus, the question decided in the first appeal is "known as the law of the case, and becomes binding precedent to be followed in successive stages of the same litigation." Id. (quotation omitted). Under this doctrine, "only such issues as have actually been decided, either explicitly, or by necessary inference from the disposition, constitute the law of the case." Id. (quotation and brackets omitted). On the other hand, "points of law not reached and decided in the first appeal remain open on remand and on a second appeal." State v. Robinson, 170 N.H. 52, 60-61 (2017) (quotation omitted).

[¶25] The State raised this same argument in the prior appeal. Indeed, in ConVal I, we explained that the parties disagreed about which components fall within the scope of RSA 193-E:2-a and must therefore be funded by the State. See ConVal I, 174 N.H. at 167. We described this dispute as "fact-driven" and as presenting "a mixed question of law and fact" that was "not suited to resolution by summary judgment." Id. at 166-67. In short, we decided that the State was not entitled to judgment as a matter of law on this basis. See id. Accordingly, the law of the case doctrine precludes us from reexamining the State's argument that determining the components necessary for adequacy is a purely legal matter. See Saunders, 160 N.H. at 566-67.

[¶26] Moreover, even if we were to consider this issue anew, we would not be persuaded. The State's own position demonstrates that factual inquiry was necessary to determine the required components. It conceded in its opening brief that, as a matter of law, RSA 193-E:2-a and the applicable regulations "reasonably cover[]" instruction, assessment, materials, and teacher professional development. At oral argument, counsel for the State acknowledged that, because those areas are covered as a matter of law, it was "fair game" for the trial court to find as a factual matter that "for instruction you're going to need teachers, for materials you're going to need technology." Counsel for the State also stated at oral argument that "there may be one or two categories" for which someone could question whether the component is "part of instruction, materials, and assessment for" the learning areas listed in RSA 193-E:2-a and "that would be an area of factual inquiry for a trial court."

[¶27] Thus, the State has recognized that it was appropriate — if not necessary — for the trial court to look beyond the plain language of RSA 193-E:2-a and associated regulations and make factual determinations about which components are necessary for adequacy. The State has not, however, articulated a convincing reason why it was "fair game" for the trial court to find that schools need teachers to provide instruction in the enumerated learning areas, yet it was not reasonable for the trial court to find, for example, that schools need facilities operation and maintenance to provide such instruction.

12

[¶28] Ultimately, the trial court began with RSA 193-E:2-a as the controlling law defining the substantive educational program that delivers the opportunity for an adequate education and then, through an extensive and comprehensive factual inquiry, determined the components "required to deliver an adequate education as defined" by that statute and the cost of those components. ConVal I, 174 N.H. at 166. In short, it performed precisely the mixed legal and factual inquiry that we directed it to undertake in ConVal I. Id. at 166-67. We therefore conclude the trial court committed no error.

D. Admissibility of Expert Testimony

[¶29] We next address the State's arguments that the trial court erred when it admitted the testimony of certain of the plaintiffs' experts.[6] New Hampshire Rule of Evidence 702 authorizes the trial court to admit expert witness testimony. To be admissible, expert testimony must rise to a threshold level of reliability. Stachulski v. Apple New England, LLC, 171 N.H. 158, 163 (2018). To determine the reliability of expert testimony, the trial court must comply with RSA 516:29-a (2021). Id. (explaining that portions of statute codify principles outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-95 (1993)). When applying RSA 516:29-a, the trial court functions as a gatekeeper, "ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony." Szewczyk v. Continental Paving, 176 N.H. 148, 156 (2023) (quotation and brackets omitted). The overall purpose of Rule 702 and RSA 516:29-a is to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence. Id.

[¶30] We review the trial court's admission of expert testimony under our unsustainable exercise of discretion standard. See Milliken v. Dartmouth-Hitchcock Clinic, 154 N.H. 662, 665 (2006). To show that the trial court's decisions were not sustainable, the State as the appealing party must show that the rulings were "clearly untenable or unreasonable to the prejudice" of its case. Id. (quotation omitted).

[¶31] The State moved in limine to exclude the expert testimony of Dr. Bruce Baker, Dr. Kimberley Rizzo-Saunders, and fourteen witnesses who are employed by the plaintiff school districts as superintendents, business administrators, chief operating officers, or chief financial officers. The trial court denied the motions prior to trial subject to its ability as fact-finder to assess at trial whether the testimony met the threshold admissibility

---

[6] The State contends that the trial court erred when it denied the State's motions to exclude or limit the testimony of "all of the plaintiffs' disclosed experts." However, several of the plaintiffs' disclosed experts either were not the subject of the State's motions in limine or did not ultimately testify at trial. We therefore confine our analysis to only those experts whose testimony the State challenged pretrial and who testified at trial.

requirements and to strike any testimony failing to do so.  See Warford v. Industrial Power Systems, Inc., 553 F. Supp. 2d 28, 31 (D.N.H. 2008) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." (quotation omitted)).  The trial court also expressly invited the parties to move to strike any trial testimony they believed did not meet the admissibility standard.  On appeal, the State does not assert that it renewed its objections to the experts' testimony at trial or that it moved to strike any portion of the challenged experts' testimony.  Nonetheless, because the trial court left its admissibility determinations open to revision at trial and both parties' briefs rely upon the trial, not the pretrial, record, we look to the trial record to determine whether the court sustainably admitted the challenged expert testimony.  See State v. Pelletier, 149 N.H. 243, 250-51 (2003) (relying upon trial testimony to affirm ruling that expert was qualified); cf. Stachulski, 171 N.H. at 163 (reviewing denial of motion in limine based only upon offers of proof presented at pretrial hearing).

[¶32] The State does not challenge the witnesses' expert qualifications; rather, it challenges the reliability of the proffered experts' testimony.  It contends that the experts' testimony did not meet the threshold of reliability because: (1) the experts failed to "tether[] their opinions to the definition of an adequate education the Legislature adopted through RSA 193-E:2-a"; and (2) the experts' opinions were not sufficiently reliable under the standards set forth in RSA 516:29-a, II(a).

[¶33] With respect to the fourteen witnesses employed by the plaintiff school districts, we conclude that the State has not sufficiently developed these arguments to warrant appellate review.  Although initially disclosed as experts, at trial these fourteen witnesses offered primarily factual testimony describing the realities of operating their respective school districts and the expenditures necessary to do so.  The State devotes at most two or three sentences in its brief, without any citations to the record, to its arguments that the testimony of these fourteen witnesses was inadmissible.  Accordingly, we deem the State's arguments as to these fourteen experts waived.  See Wyle v. Lees, 162 N.H. 406, 414 (2011).

[¶34] We now turn to the State's arguments as applied to Baker and Rizzo-Saunders.  The State first avers that these experts failed to base their opinions on the definition of adequacy in RSA 193-E:2-a.  This argument rests on a premise we have already rejected — that the components necessary for an adequate education can be determined solely as a matter of law.  Furthermore, such objections to the basis for the experts' opinions — the extent and accuracy of the experts' understanding of the relevant legal definitions — go "to the weight to be accorded the opinion evidence, and not to its admissibility." State v. Cort, 145 N.H. 606, 614 (2000).  "The appropriate method of testing

the basis of an expert's opinion is by cross-examination of the expert." Id. The State had ample opportunity at trial to test any purported defects in the witnesses' understanding of the definition of an adequate education.

[¶35] The State next contends that the trial court erred when it determined that the proffered expert testimony was sufficiently reliable under the standards set forth in RSA 516:29-a, II(a). RSA 516:29-a, II provides:

> (a) In evaluating the basis for proffered expert testimony, the court shall consider, if appropriate to the circumstances, whether the expert's opinions were supported by theories or techniques that:
>> (1) Have been or can be tested;
>> (2) Have been subjected to peer review and publication;
>> (3) Have a known or potential rate of error; and
>> (4) Are generally accepted in the appropriate scientific literature.

> (b) In making its findings, the court may consider other factors specific to the proffered testimony.

(Emphasis added.) The II(a) factors are "meant to be helpful, not definitive." Baxter v. Temple, 157 N.H. 280, 284 (2008) (quotation omitted). Indeed, these factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." Id. (quotation omitted).

[¶36] Based upon our review of the record, we conclude that the trial court sustainably admitted Baker's testimony. Baker testified about the report he produced in collaboration with other researchers for the New Hampshire General Court Commission to Study School Funding in 2020, which used statistical modeling to predict the spending needed to achieve certain educational outcomes. The Commission subsequently adopted the "outcomes-based model" proposed in the report "as the best, most rational and empirically justified approach to establishing school funding policy." The report estimated the per pupil cost of adequacy for a theoretical school district enrolling elementary students only. Baker then independently extrapolated upon the report calculation to estimate the per pupil cost in a theoretical district with average student enrollments in elementary, middle, and high school. He opined that such cost is $9,964 per pupil — excluding transportation costs.

[¶37] The trial record supports that Baker's methodology was reliable under RSA 516:29-a, II(a). One of the State's experts testified that Baker employed one of the four generally accepted methods for calculating the cost of education, and testimony of the same expert demonstrated that Baker's statistical analyses could be tested and replicated. See RSA 516:29-a, II(a)(1), (4). Further, the formal report produced for the Commission illustrates that

Baker's work has been published and that it has a known rate of error.  See RSA 516:29-a, II(a)(2)-(3).

[¶38] In contrast, Rizzo-Saunders' opinion testimony was not premised upon academic research or statistical models, but on her education and thirty years of experience.  Accordingly, we find no error in the trial court's pretrial ruling that the RSA 516:29-a, II(a) factors had little applicability to her testimony.  See RSA 516:29-a, II (listing factors court shall consider "if appropriate to the circumstances" and providing that "court may consider other factors specific to the proffered testimony"); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999) ("[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").  Nevertheless, the trial record amply supports that Rizzo-Saunders' testimony met the threshold of reliability.

[¶39] Rizzo-Saunders is the superintendent of Contoocook Valley School District and has, over her thirty-year career, worked in many capacities in New Hampshire schools, including as a teacher, curriculum coordinator, and principal.  She reached her opinion as to the cost of the opportunity for an adequate education after working with three colleagues to apply an "input methodology" that examined the necessary components and their costs on a per pupil basis.  Their analysis began with the components and costs adopted by legislative committees studying the cost of an adequate education in 2008 and 2018.  See Laws 2007, 270:2 (establishing the Joint Legislative Oversight Committee on Costing an Adequate Education); Laws 2017, 190:1 (establishing committee to study education funding and cost of opportunity for adequate education).  Rizzo-Saunders then "adjusted the components that were the least consistent with real world costs."  Those adjustments were based upon her education, training, and decades of experience in the field — including her involvement in the budget process — as well as DOE data and information gathered from colleagues in other school districts.  She opined that the cost of adequacy is $9,929 per pupil excluding transportation.

[¶40] The similarities between Rizzo-Saunders' approach and that of the legislative committees provide an objective basis upon which the trial court could deem her methodology reliable.  The record reflects the basis for and the reasoning behind her deviations from the components and costs in the 2008 and 2018 legislative committee reports, which permitted the trial court to evaluate the weight to be accorded her testimony.  See Szewczyk, 176 N.H. at 160-61 (reversing trial court's exclusion of expert testimony about cause of roadway flooding even though expert theory had not been tested and expert had not relied upon scientific studies to support hypothesis).  We conclude that the State has not met its burden of demonstrating that the trial court's admission of the testimony of Baker and Rizzo-Saunders was clearly

16

untenable or unreasonable to the prejudice of its case.  See Milliken, 154 N.H. at 665.

    E.  Merits of the Facial Constitutional Challenge to RSA 198:40-a, II(a)

[¶41] On the merits, the State argues that the trial court erred when it concluded that the plaintiffs met their initial burden of showing a clear and substantial conflict between RSA 198:40-a, II(a) and Part II, Article 83 of the State Constitution.  The plaintiffs counter that the record supports the trial court's conclusion that they satisfied their burden and that, once the burden shifted to the State, it "failed to provide any evidence to meet its burden of proof under strict scrutiny."  We agree with the plaintiffs.

[¶42] Although we review de novo the trial court's ultimate conclusion as to the constitutionality of the statute, see ConVal I, 174 N.H. at 161, we will uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous, see Gaucher v. Waterhouse, 175 N.H. 291, 295 (2022).  We defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given to the evidence.  Id. at 296.  It is within the province of the trial court to accept or reject, in whole or in part, whatever evidence was presented.  Id.

[¶43] The State concedes that the following components are necessary for adequacy: teachers, guidance counselors, library and media specialists, technology coordinators, instructional materials, technology, and teacher professional development.  As to the other components that the trial court included in its cost calculations, the State argues only that the trial court should not have included them as a matter of law — an argument that we rejected above.  The State does not, however, dispute that there is evidentiary support for the additional components the trial court found necessary for adequacy.  Based on our review of the record, we conclude that there is evidentiary support for the trial court's inclusion of the components conceded by the State, as well as the other components that the trial court found are necessary to provide the opportunity for the adequate education described in RSA 193-E:2-a: facilities operation and maintenance, transportation, principals, administrative assistants, custodians, and nurses.[7]  The trial

---

[7] Notably, all but one of the components found by the trial court (nurses) were also included by the Joint Legislative Oversight Committee on Costing an Adequate Education in its 2008 report estimating the per pupil cost of providing the opportunity for an adequate education as defined in RSA 193-E:2-a.  See Laws 2007, 270:2 (establishing Joint Committee); Laws 2008, 173:1, II-III, :5 (Joint Committee's report formed "an integral basis of the costing determinations reflected" in act that, among other things, repealed and reenacted RSA 198:40-a).  Consistent with that report, the State took the position in prior school funding litigation that transportation and facilities operation and maintenance are necessary for adequacy.  See Londonderry Sch. Dist. v. State, 157 N.H. 734, 743-44 (2008) (Londonderry II) (Duggan, J., dissenting) ("The State maintains that the

court's declaratory judgment calculation, which totaled $4,752.34 per pupil, was the sum of the per pupil costs of only the following subset of the components it found necessary for adequacy: teachers ($3,157.34), principals ($262), administrative assistants ($115), guidance counselors ($182), library and media specialists ($123), technology coordinators ($121), custodians ($98), nurses ($294), instructional materials ($300), and technology ($100).

[¶44] The State's overarching critique of this calculation is that it "is not the lowest adequate figure the trial court could have found." To the extent the State argues that, to calculate the cost of the opportunity for an adequate education, the trial court should have used the sum of the lowest costs at which any school district could provide each of the necessary components, we disagree. In practice, a calculation that tallies up the lowest cost to provide each component statewide could result in a total cost that fails to sufficiently fund the opportunity for an adequate education in many school districts. For example, the trial record reflects that while one school district can recruit and retain first-year teachers necessary for adequacy at a starting yearly salary of $39,000, another district is unable to do so with a salary of over $43,000. These facts illustrate a reality we have previously acknowledged: "the cost of a constitutionally adequate education may not be the same in each school district." Opinion of the Justices (Reformed Public School Financing System), 145 N.H. 474, 478 (2000); see also Claremont II, 142 N.H. at 473-74 (explaining that right to constitutionally adequate education "is not the right to horizontal resource replication from school to school and district to district").

[¶45] The legislature has nevertheless chosen to fund the cost of an adequate education through a universal amount of per pupil base adequacy aid. See RSA 198:40-a, II(a). The amount of base adequacy aid must therefore be sufficient to provide the opportunity for an adequate education in each and every school district in the state. See Opinion of the Justices, 145 N.H. at 478 ("It is . . . the State's obligation to underwrite the cost of an adequate education for each educable child."). Given that the constitution mandates statewide adequacy, the legislature's costing and funding of public education may constitutionally exceed the adequacy threshold, but it may not fall short. See id. ("The constitution mandates statewide adequacy — not statewide equality."); see also Claremont II, 142 N.H. at 474 (observing that government action or inaction causing an individual school or school district to "offer[] something less than educational adequacy" will be subject to strict scrutiny). We therefore reject the implication that the trial court was compelled to determine the cost of providing an adequate education in a manner that could result in constitutionally insufficient funding in some school districts.

universal cost per pupil also includes . . . facilities operation and maintenance, and transportation . . . ." (quotation omitted)).

18

[¶46] The State also attacks the declaratory judgment calculation on the ground that the trial court did not "identify, and the record does not reveal, what portion" of its calculation covers services that are not constitutionally mandated and "may go beyond adequacy." It provides two specific examples of costs included by the trial court that may go beyond adequacy: instruction and materials in subject areas falling outside of RSA 193-E:2-a, as well as certain aspects of teacher health insurance. To be clear, the State does not dispute that the cost of instruction and materials and teacher health insurance are necessary for adequacy; rather, it contends that the trial court failed to exclude the cost of instruction and materials for certain courses the State asserts fall outside the scope of RSA 193-E:2-a and that the trial court's teacher health insurance cost was greater than necessary to provide adequacy. These arguments concern factual determinations made by the trial court, to which we owe deference. See Gaucher, 175 N.H. at 295-96.

[¶47] The trial court's conservative approach to costing teachers, instructional materials, and technology corrected for any amounts that may go beyond adequacy. The trial court adopted Rizzo-Saunders' conservative cost estimates for materials and technology, which she determined five years prior to trial and which she testified were likely less than necessary. Further, in determining the overall per pupil cost of teachers, the trial court declined to adopt an increase for "specialty teachers," which was included in Rizzo-Saunders' calculations, and applied a higher student-teacher ratio than did Rizzo-Saunders.

[¶48] The trial court's approach to costing teacher health insurance also adjusted for any expenditures that may exceed adequacy. The trial court expressly deviated from Rizzo-Saunders' calculation to account for teachers who select a single-person plan, a buyout, or opt out of coverage. That adjustment is supported by the record. The record also supports the percentage of employer contribution to health insurance coverage that the trial court adopted, which was two percent less than that proposed by Rizzo-Saunders and which fell in the middle of the contribution ranges other witnesses testified were necessary to recruit and retain teachers to achieve adequacy. Accordingly, we are not persuaded that the trial court's inputs for these two specific cost areas failed to account for expenditures exceeding the adequacy threshold.

[¶49] Even if the trial court did not use the lowest possible cost for these components, it declined to include the cost of several other components in its declaratory judgment calculation, which more than offset any potential overages. The trial court omitted the per pupil cost of several components that it found necessary to adequacy — teacher professional development, facilities operation and maintenance, and transportation — which it valued collectively at $1,780 per pupil. We conclude that the trial court's conservative approach,

19

applied throughout and on a line-by-line basis, ensured that it corrected for any costs that "may go beyond adequacy."

[¶50] Comparing the declaratory judgment calculation of $4,752.34 per pupil and the $4,100 per pupil provided in RSA 198:40-a, II(a) results in a deficit of $652.34 per pupil. We conclude that this is a conservative estimate of the actual deficit. There is competent evidence in the record that the cost of providing an adequate education without including the cost of transportation is more than double what the trial court found: Rizzo-Saunders opined that it is $9,929 per pupil and Baker's estimate was $9,964. It is also undisputed that the statewide average public school per pupil expenditure for the 2021-2022 school year was $19,399.97, and that no school district reported expenditures of less than $14,000 per pupil that year. There is also evidence that charter schools, which are exempt from some legal requirements applicable to other public schools, spend on average more than $9,000 per pupil. See RSA 194-B:2 (2018) (governing establishment of chartered public schools); see also RSA 194-B:1-a, V (2018) (providing that part of purpose of chapter is to "[e]xempt charter schools from state statutes and rules, other than where specified"). For all the reasons discussed above, we conclude that the trial court's declaratory judgment calculation was conservative, supported by the record, and eminently reasonable.

[¶51] We hold that the evidence demonstrates a significant shortfall in the State's funding of base adequacy aid, creating a clear and substantial conflict between RSA 198:40-a, II(a) and Part II, Article 83 of the State Constitution as to all, or virtually all, of New Hampshire's school districts. See ConVal I, 174 N.H. at 161. Accordingly, the trial court properly concluded that the plaintiffs defeated the presumption that the current level of base adequacy aid is constitutionally sufficient.

[¶52] The burden then shifted to the State to justify RSA 198:40-a, II(a) under strict scrutiny. See Akins, 154 N.H. at 72-73. To satisfy the strict scrutiny standard, a law must "be justified by a compelling governmental interest and must be necessary to the accomplishment of its legitimate purpose." Id. at 73 (quotation omitted).

[¶53] On appeal, the State has not identified a "compelling governmental interest" justifying the current level of funding, nor has it otherwise disputed the trial court's conclusion that, once the burden shifted, the State failed to meet it. The trial court observed, and the record confirms, that "the State did not offer affirmative evidence justifying the sufficiency of the current funding level."

[¶54] The State called three witnesses at trial. Two of those witnesses were experts who offered no opinion as to the cost of providing the opportunity for an adequate education and who did not attempt to explain the sufficiency of

current base adequacy aid; rather, these experts merely critiqued the analyses and conclusions of the plaintiffs' experts. One expert conceded that he did not "know the components necessary to provide a constitutionally adequate education" or "how much it costs" to provide. The other expert opined that determining the cost of an adequate education in any state is not "a feasible exercise" and explained that he does not believe "there is any costing method to cost out adequacy that is reliable." That expert also acknowledged that in 2001 he had estimated the cost of a "foundation budget" for a hypothetical school district in Massachusetts to be approximately $6,300 per pupil — equal to $10,512 adjusting for inflation through April 2023. The State's third witness, the business administrator for one of the plaintiff school districts, testified that he had previously been tasked with creating a budget for the district that was funded solely by base adequacy aid and differentiated aid. He explained that he did not complete that exercise, however, because he became frustrated when, even after cutting essential personnel, it became evident that he could not create a workable budget funded by only those sources of aid.

[¶55] In short, rather than presenting affirmative evidence to the trial court of the sufficiency of base adequacy aid, the import of the testimony of the State's witnesses is that it is impossible for the State to satisfy its constitutional obligation of determining the cost of the opportunity for an adequate education. See ConVal I, 174 N.H. at 156-57; see also Londonderry I, 154 N.H. at 162 ("Whatever the State identifies as comprising constitutional adequacy it must pay for."). Accordingly, the trial court properly concluded that the State failed to meet its burden of justifying RSA 198:40-a, II(a).

[¶56] The State argues in the alternative that we should reverse the trial court's declaration that RSA 198:40-a, II(a) is facially unconstitutional because that ruling violated the separation of powers doctrine or that we should conclude that the plaintiffs' constitutional challenge is nonjusticiable. We are unpersuaded. Given that it is the judiciary's "constitutional duty . . . to review whether laws passed by the legislature are constitutional," Baines v. N.H. Senate President, 152 N.H. 124, 129 (2005), we see no separation of powers issue.

[¶57] Nor are we convinced by the State's justiciability argument. Having failed to raise this issue in ConVal I, the State raises it in this appeal at the end of its opening brief. See Petition of Smart, 175 N.H. 656, 658 (2023) (describing justiciability as a "threshold matter"). Our school funding jurisprudence spanning the last three decades conclusively demonstrates the justiciability of the constitutional question presented. See, e.g., Londonderry I, 154 N.H. at 156-57, 162-63 (summarizing history of school funding litigation and observing that, in the absence of legislative action, potential judicial remedies could include remand for factual development and determination by trial court as to whether State is providing sufficient adequacy funding).

21

[¶58] Tacitly acknowledging this reality, the State contends in its reply brief that, "if this Court's past school-funding decisions contemplate or authorize what the trial court did here, then those decisions have rendered challenges under Part II, Article 83 nonjusticiable." This argument turns the doctrine of justiciability on its head in that it would require us to first adjudicate the merits of this dispute and then decide, based on that outcome, whether the question presented is nonjusticiable. This we will not do. See Baines, 152 N.H. at 128 ("If a question is not justiciable, it is not ours to review."); Richard v. Speaker of the House of Representatives, 175 N.H. 262, 267 (2022) (deciding first whether issues appealed were justiciable because, if issues are nonjusticiable, we would lack jurisdiction and could not "proceed to the merits of the appeal" (quotation omitted)). We therefore affirm the trial court's declaratory judgment that the statute is facially unconstitutional.

II

[¶59] We next turn to the trial court's award of injunctive relief. The issuance of injunctions, either temporary or permanent, has long been considered an extraordinary remedy. Murphy v. McQuade Realty, Inc., 122 N.H. 314, 316 (1982). It is within the trial court's sound discretion to grant an injunction after consideration of the facts and established principles of equity. Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012). The decision to grant equitable relief necessarily depends upon the factual circumstances in each case. City of Keene v. Cleaveland, 167 N.H. 731, 742 (2015). We will uphold the trial court's factual findings unless the evidence does not support them or they are erroneous as a matter of law. Malborn Realty Trust, 164 N.H. at 66. We will uphold the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact. Id.

[¶60] The trial court's injunction has two elements: the determination of "a conservative minimum threshold of $7,356.01 which base adequacy aid funding must exceed"; and a directive that the State immediately make base adequacy aid payments of $7,356.01 per pupil pending further legislative action. The State challenges both aspects of the ruling, arguing that the court's figure is not adequately supported by the record and that the court's directive to the State to increase funding immediately violates the separation of powers doctrine. As set forth in Part II(A), three members of this court agree with the trial court's determination of a conservative minimum threshold amount; a distinct three members of the court agree with the reasoning and the conclusion in Part II(B) that the trial court erred when it issued the immediate payment directive. Accordingly, although we affirm the trial court's injunctive ruling in part, we reverse it to the extent that it ordered the State to immediately increase base adequacy aid.

22

A.  Conservative Minimum Threshold for Base Adequacy Aid

[¶61] At the outset, we reject the State's argument that the trial court's conservative minimum threshold violates the Separation of Powers Clause.  The Separation of Powers Clause, N.H. CONST. pt. I, art. 37, prevents one branch from usurping an essential power of another.  See New Hampshire Health Care Assoc. v. Governor, 161 N.H. 378, 386 (2011).  Here, the trial court painstakingly crafted the unique remedy of the conservative minimum threshold amount to avoid usurping any essential powers of the other branches.

[¶62] The trial court began its consideration of the appropriate remedy by weighing separation of powers concerns.  In deference to the legislature, the trial court declined to determine the "exact per-pupil amount of [base adequacy aid] funding necessary."  Instead, it weighed separation of powers concerns along with the history of school funding litigation, the significance of the fundamental right to an adequate education, and the need for a judicial remedy, and determined that it should establish "a conservative minimum threshold" that base adequacy aid "must exceed": $7,356.01.

[¶63] The trial court clarified in its order on the State's motion to reconsider that this minimum threshold is intended to serve as a guidepost "if the legislature maintains the existing funding scheme in substantial part," but that its ruling "does not prohibit the legislature from meaningfully altering the education funding scheme, so long as such alterations provide New Hampshire children with the opportunity for a constitutionally adequate public education." (Emphasis added.)  In crafting a conservative minimum threshold, the trial court carefully avoided the usurpation of legislative or executive branch powers.

[¶64] We next turn to the State's evidentiary challenges to the conservative minimum threshold amount.  The trial court reached the conservative minimum threshold figure of $7,356.01 based on the following components and per pupil costs: teachers ($3,981.01), principals ($262), administrative assistants ($115), guidance counselors ($182), library and media specialists ($123), technology coordinators ($121), custodians ($98), nurses ($294), instructional materials ($300), technology ($100), teacher professional development ($30), facilities operation and maintenance ($1,000), and transportation ($750).  The trial court made two key changes in this analysis relative to its declaratory judgment calculation: it included the cost of all components it found necessary for adequacy and, in calculating the cost of teachers, it reduced the student-teacher ratios.

[¶65] The State contests the student-teacher ratios used by the trial court, arguing that there is "no evidentiary basis for the trial court to conclude that the State Constitution requires lower class sizes or student-teacher ratios

23

than" those applied in 2008 by the Joint Legislative Oversight Committee on Costing an Adequate Education and reflected in the applicable administrative rule relied upon by the State. See N.H. Admin. R., Ed 306.17 (2014) (governing class size and providing that kindergarten through second grade classes shall have 25 or fewer students per educator and that third through twelfth grade shall have 30 students or fewer per educator) (readopted with amendment, retitled "Student-Educator Ratios," and renumbered to Ed 306.14, eff. Dec. 13, 2024). We disagree. The record amply supports the trial court's conclusions regarding student-teacher ratios.

[¶66] The trial court applied ratios of 1:18.75 (grades K-2) and 1:22.50 (grades 3-12) respectively for a blended ratio of 1:21.63. It used the 1:25 and 1:30 ratios relied upon by the State as its starting point, even though those ratios were derived from an administrative rule governing class sizes, not student-teacher ratios, and the record supports the trial court's observation that "'class size' is very different from 'student to teacher ratio.'" The trial court then reduced those ratios to account for the fact that teachers can provide classroom instruction for "at most" 75% of the school day due to the necessity of a lunch break and a preparation period. The record supports that it would not be possible to recruit and retain teachers to provide classroom instruction during the entire school day and that 75% instruction time is a conservative estimate necessary to ensure adequacy.

[¶67] The State does not raise any additional evidentiary challenges to the injunctive relief calculation that differ from those we addressed above in the context of reviewing the declaratory judgment calculation. Nonetheless, we observe that there is record support for the per pupil costs of the additional components the trial court included in its injunctive relief calculation — teacher professional development, facilities operation and maintenance, and transportation — and that the trial court adjusted the amounts as necessary to remove costs that may go beyond adequacy. We therefore conclude that the trial court's injunctive relief calculation is supported by the record. See Malborn Realty Trust, 164 N.H. at 66. Accordingly, we affirm the trial court's injunction to the extent it established "a conservative minimum threshold of $7,356.01 which base adequacy aid funding must exceed" as guidance for future legislative action.

B. Immediate Payment Directive

[¶68] In denying the State's request for a stay, the trial court additionally directed that, pending appeal and further legislative action, the State must increase its base adequacy aid payments to the threshold — $7,356.01 per pupil — effective immediately. In reaching this ruling, the trial court balanced the parties' competing interests, separation of powers concerns, the history of school funding litigation, and the "depriv[ation] of [public school children's] fundamental right to a constitutionally adequate public education."

24

[¶69] The State asserts that we must reverse this directive because it violates the separation of powers doctrine by usurping the legislature's power of appropriation or the Governor's authority over expenditures of public funds. We reject this argument to the extent that it relies on the premise that the Separation of Powers Clause acts as a complete bar to such a judicial remedy. It is the judiciary's responsibility to "interpret the State Constitution," Claremont School Dist. v. Governor (Motion for Extension of Deadlines), 143 N.H. 154, 161 (1998), to ensure that the fundamental constitutional right to a State funded constitutionally adequate education is not hollowed out, and to provide a judicial remedy in the absence of action by the other branches, see Londonderry I, 154 N.H. at 163; Claremont II, 142 N.H. at 473. Indeed, we have previously acknowledged that, in an action for "injunctive relief and a declaratory judgment that the system by which the State funded public education was unconstitutional," a trial court has jurisdiction to grant equitable relief. Claremont School Dist. v. Governor (Costs and Attorney's Fees), 144 N.H. 590, 593 (1999); see also New Hampshire Health Care Assoc., 161 N.H. 386 ("Unlike most state constitutions the language of the New Hampshire Constitution recognizes that separation of powers in a workable government cannot be absolute." (quotation omitted)).

[¶70] However, not every declaration of a constitutional violation warrants injunctive relief. See, e.g., Claremont II, 142 N.H. at 476 (holding unconstitutional the State's public education funding scheme, but declining to remand for consideration of remedies and, instead, staying proceedings "to permit the legislature to address the issues involved in this case"). Rather, the award of such equitable relief "necessarily depends upon the factual circumstances in each case" and the balance of the equities. Cleaveland, 167 N.H. at 742 (quotation omitted). Trial courts have "considerable discretion" in determining whether to grant injunctive relief and what form it should take, id. (quotation omitted); however, "[a] trial court unsustainably exercises its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." Lawrence v. Philip Morris USA, 164 N.H. 93, 96 (2012) (quotation omitted).

[¶71] Although we have rejected the proposition that the separation of powers doctrine categorically prohibits the judiciary from awarding injunctive relief like the immediate payment directive should the circumstances and the equities dictate, we conclude that, under the unique facts of this case, the trial court did not accord sufficient weight to separation of powers considerations in crafting the specific injunctive relief that it ordered. Cf. Private Truck Council of America, Inc. v. State, 128 N.H. 466, 477 (1986) (indicating that the doctrine of separation of powers is an appropriate consideration when contemplating injunctive relief). It failed to properly weigh the distinct and heightened separation of powers ramifications of its immediate payment directive and,

25

relatedly, it failed to consider separation of powers concerns in relation to the absence of prior litigation on the narrow legal issue presented in this case.

[¶72] It is the province of the legislature to appropriate public funds, which the Governor then has the authority to expend in accord with that appropriation.  See New Hampshire Health Care Assoc., 161 N.H. at 386-87.  Further, in the school funding realm, it is the responsibility of the legislative and executive branches — not ours — to "establish educational policy" and "determine the proper way to finance its implementation."  Claremont II, 142 N.H. at 475.  The immediate payment directive — a mandatory injunction requiring, by the State's calculation, the expenditure of over $500 million annually — directly implicates the essential powers of the legislative and executive branches.  See Marlyn Nutraceuticals v. Mucos Pharma GmbH & Co., 571 F.3d 873, 878-79 (9th Cir. 2009) (comparing a prohibitory injunction, which preserves the status quo, with a mandatory injunction, which requires the responsible party to "take action" (quotation omitted)).

[¶73] As recognized by the trial court, the separation of powers implications of its order must be considered in the context of the history of school funding litigation.  Although the trial court properly considered the history of school funding litigation broadly as a relevant factor, it failed to take into account the history of the narrow legal issue presented by this appeal: the constitutionality of RSA 198:40-a, II(a), which funds the opportunity for an adequate education as defined in RSA 193-E:2-a.  Within a year of our decision in Londonderry I, the legislature enacted RSA 193-E:2-a, defining the opportunity for an adequate education.  See Laws 2007, 270:1-:2.  The following year, the legislature repealed and reenacted RSA 198:40-a to set forth the cost of the opportunity for an adequate education.  See Laws 2008, 173:1, :5.  That version of RSA 198:40-a contained the same essential features as the statute at issue here: it set forth the annual cost of providing the opportunity for an adequate education by providing an amount of base adequacy aid per pupil and additional differentiated aid per pupil for students falling into certain categories.  Compare Laws 2008, 173:5, with RSA 198:40-a (Supp. 2024).  That law became effective in July 2009.  Laws 2008, 173:18.  The plaintiffs did not file this lawsuit until nearly ten years later.  During that time, this court had no occasion to address the constitutionality of either RSA 193-E:2-a or RSA 198:40-a.

[¶74] This situation stands in contrast to the history of school funding litigation regarding, for example, the definition of a constitutionally adequate education.  In Claremont I, we made clear that defining a constitutionally adequate education is a task for the legislative and executive branches and expressed confidence in their fulfillment of that task.  Claremont I, 138 N.H. at 192-93.  We deferred to the legislature over the next decade.  See, e.g., Claremont (Motion for Extension of Deadlines), 143 N.H. at 160 (declining invitation to determine whether definition of adequate education was facially

26

unconstitutional because State conceded its work on that task was incomplete). In Londonderry I, after reviewing our prior decisions in which we emphasized the responsibility of the legislative and executive branches to define a constitutionally adequate education with specificity, and holding that RSA 193-E:2 standing alone failed to do so, we retained jurisdiction with the expectation that the legislature would fulfill its responsibility by the end of the following fiscal year. See Londonderry I, 154 N.H. at 156-57, 160-63.

[¶75] By contrast, this is the first time that our court will have held that a level of funding provided under RSA 198:40-a, II(a) is insufficient to cover the cost of the opportunity for an adequate education as defined in RSA 193-E:2-a. Accordingly, under these circumstances, we cannot say that there has been an "absence of action by other branches," id. at 163, with respect to the specific issue now before us. In sum, we conclude that, in imposing the extraordinary directive for immediate payment, the trial court failed to accord sufficient weight to separation of powers concerns viewed in the context of the history of the narrow legal issue presented, and the court thereby unsustainably exercised its discretion. See Lawrence, 164 N.H. at 96.[8]

III

[¶76] Finally, we address the issue of attorney's fees. The trial court granted the plaintiffs' request for an award of reasonable attorney's fees under the substantial benefit theory. The State does not challenge this basis for the award; rather, it asserts that, because the trial court erred in its ruling on the merits, it also erred in awarding attorney's fees to the plaintiffs. Given our affirmance of the trial court's merits ruling, we reject this argument. It is, however, unclear from the record before us whether the trial court has already determined the amount of the plaintiffs' reasonable attorney's fees. In light of the reversal of the trial court's immediate payment directive, on remand, the trial court should consider whether the plaintiffs are entitled to reasonable fees with respect to all the issues for which they seek reimbursement. See Claremont (Costs and Attorney's Fees), 144 N.H. at 598.

---

[8] Justices Countway and Donovan are of the opinion that the trial court erred when it concluded that, in the absence of the immediate payment directive, the children attending public schools in New Hampshire would suffer irreparable harm. I observe that, in their complaint, the plaintiffs alleged harm to local taxpayers occasioned by the need to "raise local property taxes . . . to make up for the State funding shortfall"; the complaint did not allege any constitutional deprivation on behalf of — or any claim of harm to — children in public schools. However, I decline to address the issue of whether the trial court erred in regard to irreparable harm because the issue was not raised or briefed on appeal by the State or by the plaintiffs. See Hodges v. Johnson, 170 N.H. 470, 490 (2017) (Bassett, J., dissenting) ("Deciding issues that have not been briefed undermines our adversary process and increases the possibility that we will err.").

27

[¶77] In summary, the record supports the trial court's conclusion that RSA 198:40-a, II(a) does not pass constitutional muster. RSA 198:40-a, II(a) does not allocate sufficient funding to cover the cost of providing students the opportunity for a constitutionally adequate public education as defined in RSA 193-E:2-a. As we have repeatedly stated, it is the State's obligation to provide such funding. See Opinion of the Justices, 145 N.H. at 477-78 ("[T]he New Hampshire Constitution imposes solely upon the State the obligation to provide sufficient funds for each school district to furnish a constitutionally adequate education to every educable child." (emphasis omitted)); Londonderry I, 154 N.H. at 162 ("Whatever the State identifies as comprising constitutional adequacy it must pay for."). We therefore affirm the trial court's expert admissibility rulings, its declaration that RSA 198:40-a, II(a) is facially unconstitutional, its determination of a conservative minimum threshold for base adequacy aid, and its award of reasonable attorney's fees to the plaintiffs. A majority of this court, however, reverses the trial court's injunction to the extent that it directed the State to immediately pay base adequacy aid of $7,356.01 per pupil pending further legislative action.

[¶78] It is now incumbent upon the legislative and executive branches to remedy the constitutional deficiency that we have identified. See New Hampshire Health Care Assoc., 161 N.H. at 386-87 (explaining that it is the province of the legislature to appropriate public funds, which the Governor then has the authority to expend in accord with that appropriation). Indeed, those branches are "'duty bound to devote every effort'" to its resolution. Claremont (Motion for Extension of Deadlines), 143 N.H. at 158 (quoting Cooper v. Aaron, 358 U.S. 1, 7 (1958)); see also Brouillard v. Governor and Council, 114 N.H. 541, 544 (1974) ("When the law is settled it will be obeyed." (quotation omitted)). We anticipate that the legislative and executive branches will fulfill their duty to provide constitutionally adequate funding. See Claremont (Motion for Extension of Deadlines), 143 N.H. at 158 ("Absent extraordinary circumstances, delay in achieving a constitutional system is inexcusable."); Claremont II, 142 N.H. at 477 (expressing confidence that "the legislature and the Governor will act expeditiously to fulfill the State's duty . . . to guarantee adequate funding in a manner that does not violate the State Constitution"). We urge the legislative and executive branches to act expeditiously to ensure that all the children in public schools in New Hampshire receive a State funded constitutionally adequate education.

Affirmed in part; reversed in part; and remanded.

COUNTWAY and DONOVAN, JJ., concurred in Part II(B) but otherwise dissented; NADEAU, J., retired superior court chief justice, and ABRAMSON, J., retired superior court justice, both specially assigned under RSA 490:3, II, concurred in Parts I, II(A), III, and IV but dissented from Part II(B).

COUNTWAY and DONOVAN, JJ., jointly concurring in Part II(B) but otherwise dissenting.

[¶79] We agree with the reasoning and the conclusion reflected in Part II(B) of the lead opinion — that the trial court erred by directing the State to increase base adequacy aid immediately — and believe that there is an additional legal basis supporting that conclusion. However, we do not share the lead opinion's view as to the merits of the plaintiffs' constitutional challenge or the trial court's injunctive relief determination of the conservative minimum threshold amount for base adequacy aid. We believe that the trial court erred when it: (1) allowed the plaintiffs to prevail upon their facial constitutional challenge to only one subparagraph of RSA 198:40-a (Supp. 2024); and (2) established a conservative minimum threshold amount that base adequacy aid must exceed, thereby invading the legislature's policy-making function. Because we would reverse the trial court's ruling that RSA 198:40-a, II(a) is facially unconstitutional and its conservative minimum threshold ruling, we respectfully dissent from the remainder of the lead opinion.

[¶80] Notwithstanding the plaintiffs' overarching allegation that the State has failed to meet its obligation to "fully fund an adequate education as required by Part II, Article 83, of the New Hampshire Constitution," their constitutional challenge is limited to one subparagraph of the statute that funds the opportunity for an adequate education — RSA 198:40-a. We question whether a facial challenge to a single provision in a multipart funding formula like that in RSA 198:40-a can follow logically. See Huckins v. McSweeney, 166 N.H. 176, 179 (2014) ("A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." (quotation omitted)). Even setting that concern aside, our standard of review on constitutional questions, our well-established principles of statutory interpretation, and the plain language of RSA 198:40-a require an examination of the constitutionality of the statute as a whole.

[¶81] As a preliminary issue, the plaintiffs assert that this court already determined in the prior appeal in this matter, see Contoocook Valley Sch. Dist. v. State of N.H., 174 N.H. 154 (2021) (ConVal I), that they could challenge the constitutionality of RSA 198:40-a, II(a) independently. However, the record and our decision in the prior appeal do not support that this specific legal issue was squarely raised and addressed. See id. at 161-68; see also Taylor v. Nutting, 133 N.H. 451, 454-55 (1990) (explaining that the law of the case doctrine does not apply "where the issue before the court was not fully briefed and squarely decided when the case was previously before the court" (quotation omitted)). The fact that, in ConVal I, this court adopted the plaintiffs' characterization of their own claim, see ConVal I, 174 N.H. at 159, is not sufficient on its own to demonstrate that we resolved the legal issue now before us.

29

[¶82] Turning to the merits, we presume a legislative act is constitutional, and we "will not declare it invalid except upon inescapable grounds." Id. at 161. Also, we will not construe a statute as unconstitutional "where it is susceptible to a construction rendering it constitutional." White v. Lee, 124 N.H. 69, 77-78 (1983). To determine whether a statute is susceptible to a constitutional construction, we apply our traditional principles of statutory interpretation and consider the intent of the legislature "as expressed in the words of the statute considered as a whole." Petition of Carrier, 165 N.H. 719, 721 (2013) (emphasis added).

[¶83] Applying these principles to RSA 198:40-a demonstrates that the legislature intended that base adequacy aid and differentiated aid together comprise the funding for the opportunity for an adequate education. The statute provides:

> I.    For the biennium beginning July 1, 2023, the annual cost of providing the opportunity for an adequate education as defined in RSA 193-E:2-a shall be as specified in paragraph II. The department shall adjust the rates specified in this paragraph in accordance with RSA 198:40-d.
>
> II. (a) A cost of $4,100 per pupil in the ADMR, plus differentiated aid as follows:
>    (b) An additional $2,300 for each pupil in the ADMR who is eligible for a free or reduced price meal anytime during the determination year; plus
>    (c) An additional $800 for each pupil in the ADMR who is an English language learner anytime during the determination year; plus
>    (d) An additional $2,100 for each pupil in the ADMR who is receiving special education services anytime during the determination year.
>
> III.    The sum total calculated under paragraph II shall be the cost of an adequate education. The department shall determine the cost of an adequate education for each municipality based on the ADMR of pupils who reside in that municipality.

RSA 198:40-a (emphases added).

[¶84] In no uncertain terms, the emphasized language states that the sum of the amounts listed in subparagraphs (a) through (d) of paragraph II constitutes the cost of an adequate education. Nothing in the statutory language indicates that the amount set out in RSA 198:40-a, II(a) — standing alone — represents the total cost of offering the opportunity for an adequate education, nor does it purport to fund adequacy solely through that provision.

30

[¶85] The trial court's construction of the statute, adopted by the lead opinion, rests on the flawed assumption that, because funds are allocated under subparagraphs (b) through (d) based upon the number of students meeting the eligibility criteria, those monies must be used only to serve eligible students. However, the plain language of the statute requires no such earmarking of funds. See id. Had the legislature intended that the use of differentiated aid be restricted to certain purposes, it knew how to do so. See Laws 2008, 173:6 (repealing and reenacting RSA 198:40-b to govern the use of differentiated aid); Laws 2016, 8:13, I (repealing RSA 198:40-b). Instead, the statutory scheme explicitly provides that funding is distributed "independent of how the municipalities decide to spend the distributions." RSA 198:48 (2008).

[¶86] This reading of the statute recognizes the importance of local control of education spending. See Claremont School Dist. v. Governor, 142 N.H. 462, 475 (1997) (Claremont II) ("We recognize that local control plays a valuable role in public education . . . ."); Opinion of the Justices (Reformed Public School Financing System), 145 N.H. 474, 478 (2000) (observing that "local school districts may choose to spend money in varying ways to provide an education for their students" provided that funds disbursed for constitutional adequacy are "used for education"). The purpose of RSA 198:40-a is not to micromanage how school districts allocate resources; rather, the statute establishes a formula for calculating the cost of an adequate education in each municipality, which is, in turn, used to determine the State's total distribution to each school district. See RSA 198:40-a; RSA 198:41, I (Supp. 2024); RSA 198:42, II (Supp. 2024). It is then up to each school district to determine how best to allocate and deploy those funds. See RSA 198:48.

[¶87] In summary, RSA 198:40-a, III provides that the sum of the amounts in paragraph II constitutes the cost of an adequate education, and, in practice, school districts can utilize funds distributed pursuant to RSA 198:40-a for any educational purpose. See RSA 198:40-a, :48. It is therefore both contrary to the plain language of the statute and illogical to disregard a portion of the funding provided therein. Thus, to assess the sufficiency of the State's funding of the opportunity for an adequate education, the trial court should have examined all the funding provided in paragraph II.

[¶88] The trial court's erroneous focus on base adequacy aid alone tainted its analysis of the central constitutional question. In the absence of findings and rulings about the amount of differentiated aid provided and the cost of delivering differentiated services, we cannot conclude that once differentiated aid funding and costs are properly considered, there is a clear and substantial conflict between RSA 198:40-a and Part II, Article 83 of the State Constitution.

[¶89] Furthermore, the trial court's injunctive relief determination of the conservative minimum threshold and its fact-finding in support of that ruling improperly invaded the legislature's policy-making function. We agree with the

31

State that the plain language of RSA 193-E:2-a and the regulations pertinent to the minimum standards for public school approval for each learning area provide the controlling law, and that, through that law, the State has agreed to pay for instruction, assessment, materials, and teacher professional development related to the statutory learning areas. See Londonderry Sch. Dist. v. State, 154 N.H. 153, 161 (2006) (Londonderry I) (explaining that definition of constitutional adequacy would delineate "where the State's obligations to fund the cost of a constitutionally adequate education begin and end"). As contemplated by ConVal I, some fact-finding was required to determine the components related to instruction, assessment, materials, and teacher professional development in the statutory learning areas — like teachers and technology. See ConVal I, 174 N.H. at 166-67.

[¶90] The trial court, however, went too far. In its injunctive relief determination of a "conservative minimum threshold . . . which base adequacy aid funding must exceed," the trial court violated our well-established separation of powers principles. As the trial court explained, it intended the conservative minimum threshold to serve as a "minimum guideline[] by which courts can swiftly measure future legislative action." This ruling improperly subjects the legislature to judicial supervision. See Piper v. Meredith, 109 N.H. 328, 330 (1969) (holding that the trial court "properly denied the injunction as it had no power to interfere with proposed legislative action"); see also Sherburne v. Portsmouth, 72 N.H. 539, 541 (1904) ("The legislative and the judiciary are coordinate departments of the state government; . . . neither shall be subject to the control or supervision of the other.").

[¶91] Moreover, the trial court made factual findings in support of its conservative minimum threshold that also intruded upon the policy-making province of the legislature. For example, instead of applying the class sizes reflected in the applicable regulation, see N.H. Admin. R., Ed 306.17 (2014) (readopted with amendment, retitled "Student-Educator Ratios," and renumbered to Ed 306.14, eff. Dec. 13, 2024), the trial court applied its own student-teacher ratios. It is not the judiciary's role to second guess such policy choices. See RSA 193-E:2-a, IV(a) (2018); see also Claremont II, 142 N.H. at 475 (acknowledging that "we were not appointed to establish educational policy"); New Hampshire Health Care Assoc. v. Governor, 161 N.H. 378, 386 (2011) ("[T]he New Hampshire Separation of Powers Clause is violated only when one branch usurps an essential power of another." (quotation omitted)).[9]

---

[9] This judicial overstepping not only raises separation of powers concerns, but it also undermines the trial court's declaratory judgment ruling. If, as just one example, the per pupil cost of nurses is excluded, the difference between the trial court's declaratory judgment calculation and statutory base adequacy aid is only $358 per pupil. We are not convinced that this difference constitutes "a clear and substantial conflict" between RSA 198:40-a and Part II, Article 83 of State Constitution. Contoocook Valley Sch. Dist. v. State of N.H., 174 N.H. 154, 161 (2021) (emphasis added).

[¶92] Finally, although we agree with the lead opinion's analysis and conclusion that the immediate payment directive must be reversed because the trial court improperly weighed separation of powers considerations, we believe there is an additional reason for reversing: the absence of a supportable finding of irreparable harm. A prerequisite to an award of injunctive relief is proof of the immediate danger of irreparable harm. See Smith v. N.H. Bd. of Psychologists, 138 N.H. 548, 554 (1994). We construe the trial court's immediate payment directive as predicated upon the immediate danger of irreparable harm that "with each passing school year, another class of public school children is permanently deprived of the fundamental right to a constitutionally adequate public education." See State v. Surrell, 171 N.H. 82, 88 (2018) ("The interpretation of a trial court order presents a question of law for us to decide.").

[¶93] The trial court's reliance on this purported irreparable harm is misplaced. The record does not support that New Hampshire's public school children are being deprived of the opportunity for an adequate education. The plaintiffs' own experts opined that expenditures of approximately $10,000 per pupil are necessary to provide the opportunity for an adequate education. The record reflects that all school districts are spending much more than that: in the 2021-2022 school year, no school district spent less than $14,000 per pupil and the average per pupil expenditure was over $19,000.

[¶94] Accordingly, we conclude that the trial court erred in determining that, in the absence of its immediate payment directive, New Hampshire public school children would suffer the irreparable harm of a deprivation of their right to an adequate education. See Smith, 138 N.H. at 554 (holding that trial court's finding of irreparable harm could not stand because it was premised on an erroneous legal conclusion and reversing permanent injunctive relief); Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012) (setting forth our standard of review for issuance of injunctions). Absent the immediate danger of irreparable harm, the trial court's payment directive cannot stand. See Smith, 138 N.H. at 554.

[¶95] For the foregoing reasons, we concur with the lead opinion's conclusion in Part II(B) that the trial court erred by issuing the immediate payment directive and we dissent from the remainder of the lead opinion.

NADEAU, J., retired superior court chief justice, and ABRAMSON, J., retired superior court justice, both specially assigned under RSA 490:3, jointly concurring in part and dissenting in part.

[¶96] We agree with almost all aspects of the lead opinion. We concur in the affirmance of the trial court's rulings related to the admissibility of expert testimony, the trial court's declaration that RSA 198:40-a, II(a) is facially unconstitutional, the trial court's decision to award the plaintiffs attorney's fees, the trial court's calculations in devising a conservative minimum threshold, and the conclusion that the Separation of Powers Clause does not act as a "complete bar" to the trial court's immediate payment directive. We disagree, however, with the lead opinion's reversal of the trial court's immediate payment directive. Accordingly, we respectfully dissent from that portion of Part II(B) of the lead opinion.

I.     Background

[¶97] Since 1784, our constitution has imposed an explicit duty on the legislature "to cherish the interest of literature and the sciences, and all seminaries and public schools." N.H. CONST. pt. II, art. 83. In fact, "education is deemed so essential to the viability of the State that part II, article 83 is one of only two places in the constitution where a duty is affirmatively placed on the legislature." Claremont School Dist. v. Governor, 142 N.H. 462, 472 (1997) (Claremont II). When it is alleged that the legislature has ignored this constitutional duty for decades, the judiciary must adjudicate the claim, and when proven, it must provide an appropriate remedy. This is precisely what the trial court did in this case.

[¶98] After years of pre-trial litigation, the trial court conducted a three-week bench trial in this matter. The trial record was extensive. There were 27 witnesses, the majority of whom were experts, and more than 750 exhibits containing thousands of pages of information. After "carefully consider[ing] the evidence presented at trial," the trial court rightfully declared in a 56-page, well-reasoned decision that the 2023 level of base adequacy aid, which was fixed by RSA 198:40-a, II(a) at just $4,100 per pupil, was constitutionally insufficient. Once it made this finding, the trial court considered whether any additional relief was warranted beyond a declaratory judgment regarding the unconstitutionality of RSA 198:40-a, II(a). Ultimately, the trial court declined to make "a judicial determination of the exact per-pupil amount of funding necessary to provide for base adequacy." (Quotation omitted.) It properly reasoned that such a finding "would infringe the constitutionally committed responsibilities of the political branches and embroil the courts in weighty policy decisions." (Quotation omitted.)

[¶99] Nonetheless, after considering the overwhelming evidence showing that the $4,100 per pupil statutory amount of base adequacy aid was "woefully

34

inadequate," the trial court found that it was "both necessary and appropriate to grant the plaintiffs a measure of additional relief." Specifically, the trial court determined that it should "establish a conservative minimum threshold" (CMT) for state education funding that would cover "those cost-drivers that are indisputably part of the State's base adequacy aid funding obligations." The trial court reasoned that this approach struck the appropriate balance between the legislature's prerogative to set policy and the judiciary's obligation to protect the constitutional right to an adequate state funded education. Based on its in-depth review of the exhaustive evidence, the trial court then determined that the CMT was $7,356.01 per pupil, which was "over $3,200 more than the current funding level of $4,100." In so ruling, the trial court observed that "the true cost is likely much higher than that," and noted that it reached that figure based on "conservative calculations." In essence, the trial court concluded that, under any view of the evidence, $7,356.01 per pupil was the absolute minimum amount of base adequacy aid that the State should be providing, even though that amount would still be "constitutionally insufficient." Once it made these findings in its merits order, the trial court granted in part "[t]he plaintiffs' request for injunctive relief . . . insofar as the Court has established a [CMT] of $7,356.01 which base adequacy aid funding must exceed."

[¶100] The State subsequently moved for reconsideration of certain aspects of the merits order, including the award of injunctive relief. In ruling on this motion, the trial court recognized that "some clarification" of its award of injunctive relief was warranted. The trial court explained that it was directing "the State to make base adequacy aid payments in an amount equal to the $7,356.01 [CMT]" as established in its merits order and that this amount needed to be immediately paid "under the existing funding model." In essence, the trial court clarified that its "injunction" was actually a directive to spend funds to provide a modicum of relief for the proven constitutional violation. The lead opinion labels this relief as an immediate payment directive (IPD).

[¶101] The State also moved to stay the effective date of the IPD for one full legislative cycle following the resolution of any appeal. In denying that request, the trial court reasoned that:

> [I]t would be inappropriate to continue funding base adequacy aid at the $4,100 level plaintiffs have proven to be woefully inadequate, and thus, unconstitutional. In reaching this conclusion, the Court observes that although the issues implicated here may seem like a simple matter of dollars and cents to some, the reality is that with each passing school year, another class of public school children is permanently deprived of the fundamental right to a constitutionally adequate public education. In light of this reality, and given the overwhelming evidence the plaintiffs presented at trial, the Court cannot endorse the State's request to

perpetuate the egregious underfunding of public education pending appeal.

. . . .

The Court notes that this funding level is far less than the plaintiffs requested and, as explained in the [merits order], the plaintiffs have proven that this funding level is also constitutionally insufficient. As a result, temporarily funding base adequacy aid at the [CMT] level will still result in a regrettable delay in achieving a constitutional system. Yet, under the extraordinary circumstances presented here, the Court concludes that this compromise strikes an appropriate balance between the parties' competing interests . . . .

(Quotation, citations, and brackets omitted.)

[¶102] This appeal followed. Although the trial court declined to stay the IPD pending appeal, the State sought similar relief from this court, which was granted. Accordingly, the trial court's IPD, which essentially requires the State to pay school districts an additional $3,256.01 per pupil in base adequacy aid pending further legislative action, has never gone into effect. On appeal, the State contends that the IPD is unconstitutional and must be vacated for that reason.

II. Discussion

A. Standard of Review

[¶103] We begin by noting that neither the State nor the plaintiffs have addressed in their briefs the appropriate standard of review for this court to employ in reviewing the IPD. Although the trial court nominally labeled the IPD as an "injunction," we are not convinced that a directive of this type, when viewed in conjunction with the trial court's declaratory judgment, should be treated or reviewed as a traditional injunction. Cf. Smith v. State, 118 N.H. 764, 769, 771 (1978) (directing legislature to make "adequate appropriations" to fund the constitutional right to counsel after finding that existing scheme was "a far cry" from meeting constitutional mandate and making no mention of traditional injunction criteria). Where, as here, the IPD serves as the "judicial remedy" to "ensure that constitutional rights not be hollowed out," Londonderry Sch. Dist. v. State, 154 N.H. 153, 163 (2006) (Londonderry I), we do not believe that the traditional injunction criteria necessarily or neatly apply to this type of remedy. See, e.g., Abbott by Abbott v. Burke, 693 A.2d 417, 456 (N.J. 1997) (ordering state to "provide increased funding to the twenty-eight districts" as a "remedial relief" for violation of constitutional right to education without any discussion of injunction criteria); see also Claremont School Dist.

36

v. Governor (Statewide Property Tax Phase-In), 144 N.H. 210, 220 (1999) (Horton, J., dissenting) (suggesting that, "'[i]n fashioning and effectuating the decrees" in school funding cases, "the courts will be guided by equitable principles'" (quoting Brown v. Bd. of Educ., 349 U.S. 294, 300 (1955)). The lead opinion and the concurrence,[10] however, treat the IPD as a traditional injunction. Although we are not persuaded that a traditional injunction analysis applies, for the purposes of our discussion, we will assume that our colleagues' treatment and review of the IPD as a traditional injunction is correct.

[¶104] Generally, "[a]n injunction should not issue unless there is an immediate danger of irreparable harm to the party seeking injunctive relief, and there is no adequate remedy at law." Murphy v. McQuade Realty, Inc., 122 N.H. 314, 316 (1982). Assuming these requirements are met, "[i]t is within the trial court's sound discretion to grant an injunction after consideration of the facts and established principles of equity." City of Keene v. Cleaveland, 167 N.H. 731, 742 (2015). "The decision to grant equitable relief necessarily depends upon the factual circumstances in each case." Id. (quotation omitted). "[B]ecause the division line between equity and law is not precise[,] courts have considerable discretion in determining whether equity should intervene to aid litigants in the protection of their legal rights." Id. (ellipses omitted). This court will "uphold the decision of the trial court with regard to the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact." Id.

B. Analysis

[¶105] In challenging the IPD, the State argues that it "constitutes an enormous, unconstitutional appropriation of taxpayer dollars" and maintains that the "[j]udiciary does not have the authority to appropriate state revenues" as "that power lies with the Legislature." We interpret this argument as raising "an error of law" challenge to the IPD, i.e., that the IPD is an unconstitutional remedy because it violates the Separation of Powers Clause of the State Constitution. See, e.g., State v. Exxon Mobil Corp., 168 N.H. 211, 222 (2015) (whether particular action "violates the Separation of Powers Clause of the State Constitution . . . is a question of law"); Petition of S. N.H. Med. Ctr., 164 N.H. 319, 324 (2012) (same). Accordingly, we begin by analyzing the State's separation of powers challenge to the IPD as a matter of constitutional law.

[¶106] "The separation of powers between the legislative, executive and judicial branches of the government is an important part of [our] constitutional fabric." Opinion of the Justices, 102 N.H. 195, 196 (1959). Generally speaking, "each branch is prohibited by the Separation of Powers Clause from

---

[10] We will refer to the joint opinion of Justice Countway and Justice Donovan as the "concurrence" throughout our opinion as they concur with the lead opinion regarding the reversal of the IPD.

encroaching on the powers and functions of another branch." Petition of Mone, 143 N.H. 128, 134 (1998). Relevant here, "Part II, Article 2 of the State Constitution vests the legislature with the 'supreme legislative power,'" which includes "the power to . . . make appropriations." New Hampshire Health Care Assoc. v. Governor, 161 N.H. 378, 386 (2011). Thus, under our constitutional system, the "executive branch may expend public funds only to the extent, and for such purposes, as they may have been appropriated by the legislature." Id. at 387.

[¶107] We acknowledge that the trial court's IPD essentially amounts to a directive to the executive branch to spend funds that were never appropriated by the legislature or an order requiring the legislature to appropriate the funds consistent with the terms of the injunction. Similar to the trial court, we are not blind to the extraordinary nature of such an order or the fact that such relief raises separation of powers questions. Indeed, this court has rightly declined to order relief in other contexts that would invade "the legislature's constitutional authority to appropriate public funds." Appeal of N.H. Troopers Ass'n, 175 N.H. 167, 178-79 (2022).

[¶108] This case, however, involves a unique type of constitutional right. Most of the constitutional rights guaranteed by our constitution "are framed as negative restrictions on government action." McCleary v. State, 269 P.3d 227, 248 (Wash. 2012). "With respect to those rights, the role of the court is to police the outer limits of government power, relying on the constitutional enumeration of negative rights to set the boundaries." Id. These types of rights can be enforced by traditional, well-established judicial remedies. In civil cases, constitutional rights are routinely recognized and enforced by enjoining the enforcement of statutes or governmental actions. In criminal cases, the judiciary vindicates the constitutional rights of our citizens through the suppression of evidence, the reversal of convictions, or even the dismissal of charges. School funding cases are different because they rest on a positive or affirmative constitutional right — the right to an adequate education paid for by the state. Accordingly, unlike most constitutional rights the courts adjudicate, the right to an adequate education requires the state to take affirmative steps to meet its constitutional obligations. See id. ("Positive constitutional rights do not restrain government action; they require it."); see also Claremont II, 142 N.H. at 472 (recognizing that the legislature has an "affirmative[]" duty with respect to education).

[¶109] As this case illustrates, the unique nature of the constitutional right to a state funded adequate education presents challenges for the judiciary when litigants prove that it is not being honored. Such cases "test the limits of judicial restraint and discretion," McCleary, 269 P.3d at 248, because they involve competing principles. On the one hand, "[i]t is long settled that this court is the final arbiter of State constitutional disputes," Smith, 118 N.H. at 768, and that "the judiciary has a responsibility to ensure that constitutional

38

rights not be hollowed out," Londonderry I, 154 N.H. at 163. Indeed, "the judicial branch derives inherent and inalienable authority to address the violation of constitutional rights from its very status as one of three separate and coordinate branches of our state government." Hoke County Bd. of Educ. v. State, 879 S.E.2d 193, 230 (N.C. 2022). On the other, our constitution vests the legislature with "the power to make laws," "to assess taxes to raise revenue for the operation of the government of the State and to make appropriations for that purpose." O'Neil v. Thomson, 114 N.H. 155, 160 (1974).

[¶110] Because of that express delegation of power to the legislature and our respect for the separation of powers, this court has recognized the importance of deferring to the legislature in the school funding arena and affording the legislature wide latitude to carry out its constitutional duty "to cherish the interest of literature and the sciences, and all seminaries and public schools." N.H. CONST. pt. II, art. 83. Indeed, this court has rightfully been hesitant to issue remedial orders that direct the State to spend more in school funding cases because such orders implicate the constitutionally delegated provinces of the other branches of government. In over three decades of litigation concerning school funding and the constitutional right to an adequate education in this state, that deference and hesitancy has always prevailed. So far, this court has declined to impose any remedies in a school funding case that would encroach on the legislature's traditional authority to appropriate funds, even where it has been established that the legislature failed to meet its constitutional obligation to fund an adequate education. See Londonderry I, 154 N.H. at 163 ("We agree with [the] concern that this court or any court not take over the legislature's role in shaping educational and fiscal policy. For almost thirteen years we have refrained from doing so and continue to refrain today.").

[¶111] This court, however, has never foreclosed the judiciary's authority to issue such relief. Rather, because of our own constitutional duty to protect the constitutional rights of our citizens, the court's deference to the legislature must have and does have "its limits." Id. That is, if the legislature "proves unwilling or unable to remedy the [constitutional] deficiency" after having been afforded "due deference," the court is obligated to "invoke its inherent power to do what is reasonably necessary to restore constitutional rights by imposing a specific remedy and instructing the recalcitrant state actors to implement it." Hoke County Bd. of Educ., 879 S.E.2d at 230 (quotation omitted). This court recognized that principle in Londonderry I, stating that "in the absence of action by other branches, a judicial remedy is not only appropriate but essential." Londonderry I, 154 N.H. at 163.

[¶112] Based on the foregoing, we believe the pertinent law can be succinctly stated as follows: the Separation of Powers Clause precludes the type of remedy ordered by the trial court as a matter of constitutional law

unless the legislature has been afforded a reasonable opportunity to act and has failed to do so in a meaningful manner.  Id.[11]

[¶113] The question becomes whether those conditions exist here.  The State asserts that they do not because "[t]he present education funding regime" has "remained in place for a decade without challenge until this lawsuit in 2018," and therefore "[d]eference . . . should have been the rule."  The lead opinion agrees with that argument in its separation of powers analysis.  Specifically, the lead opinion points to the enactment of RSA 198:40-a, II(a), which sets the amount of base adequacy aid at just $4,100 per pupil, and the fact that "this is the first time that our court will have held that [the] level of funding provided under RSA 198:40-a, II(a) is insufficient" to pass constitutional muster.

[¶114] We do not believe that the mere enactment of RSA 198:40-a, II(a) constitutes the type of meaningful "action" that bars a judicial remedy on separation of powers grounds.  As the lead opinion observes, the evidence in the record strongly suggests that the true "cost of providing an adequate education" is likely near $10,000 per pupil.  In fact, as the trial court noted, one of the experts who testified, Dr. Bruce Baker, was previously hired by the legislature in 2020 "to analyze school funding issues and provide an informed recommendation."  Baker opined that the cost of providing an adequate education was $9,964.  Thus, the legislature seemingly ignored its own expert's recommendations and instead chose to fund base adequacy aid "at less than half of his recommended level."  To us, this demonstrates that the legislature

---

[11] In reaching this conclusion, we have looked to other circumstances where this court has decided to act in areas traditionally within the province of the legislature and provided non-traditional remedies.  The most analogous situation we can find is the line of redistricting cases.  See, e.g., Monier v. Gallen, 122 N.H. 474 (1982); Below v. Secretary of State, 148 N.H. 1 (2002); Burling v. Speaker of the House, 148 N.H. 143 (2002); Norelli v. Sec'y of State, 175 N.H. 186 (2022).  Much like the power to appropriate, the constitution vests the legislature with the exclusive power to draw legislative districts and the obligation to do so every ten years to ensure that "the constitutional imperative of one person/one vote" is honored following the federal census.  Petition of Below, 151 N.H. 135, 136, 137 (2004).  Should the legislature fail to perform that task, however, this court is "drawn reluctantly into" performing it for the legislature, Burling, 148 N.H. at 144, in order "to protect the people's constitutional right to one person/one vote," Petition of Below, 151 N.H. at 136.  Thus, even though redistricting is clearly committed to the legislature by our constitution, it nonetheless becomes "the judiciary's duty to devise a constitutionally valid reapportionment plan" when "the legislature has failed to act."  Burling, 148 N.H. at 144.

We find these cases supportive because they illustrate that the judiciary's duty "to protect the people's constitutional right[s]," Petition of Below, 151 N.H. at 136, can be "more important" than "judicial non-intervention" for separation of powers concerns, Norelli, 175 N.H. at 200.  They also acknowledge "that separation of powers in a workable government cannot be absolute." Petition of Judicial Conduct Comm., 151 N.H. 123, 127 (2004) (quotation omitted).  We believe that school funding cases are on the same footing as the redistricting cases and likewise call for the judiciary to employ non-traditional remedies to protect important constitutional rights when the legislature fails to do so in a timely and meaningful manner.

knew or should have known that $4,100 per pupil was far too low, and therefore it should hardly come as a surprise that this figure is not constitutionally adequate. See Montoy v. State, 112 P.3d 923, 940 (Kan. 2005) (ordering state to increase education funding where legislature commissioned education study and then "chose to impugn its design and ignore its recommendations"). In short, we do not find that knowingly enacting a statute that "woefully" underfunds education shows good faith "action" on behalf of the legislature such that the judiciary is precluded from exercising its duty to provide a meaningful remedy.

[¶115] In addition, we find that the State's and the lead opinion's narrow focus on this specific statute fails to consider that the constitutional requirement of a state funded adequate education has not been fully funded for decades. By our count, there have been at least eleven cases before this court concerning school funding since 1993. As far as we are aware, not once has this court conclusively determined that the legislature has fulfilled its constitutional duty. In many of these cases, after finding a constitutional violation, the court has expressed its confidence "that the legislature and the Governor will act expeditiously to fulfill the State's duty to provide for a constitutionally adequate public education," Claremont II, 142 N.H. at 477, or simply "urge[d] the legislature to act," Londonderry I, 154 N.H. at 163. Despite the court's optimism and deference in this long line of cases, the legislature still has not enacted a constitutionally adequate school funding scheme. In 1998, this court observed that "delay in achieving a constitutional system [of adequate school funding] is inexcusable" and that "[t]he legality of the education funding system in this State has been questioned for at least the past twenty-seven years." Claremont School Dist. v. Governor (Motion for Extension of Deadlines), 143 N.H. 154, 158 (1998) (emphases added). Nearly 30 years have passed since this court made that observation. If the delay was "inexcusable" in 1998, id., it is beyond comprehension today.

[¶116] For these reasons, we cannot join in the lead opinion's conclusion that there has been meaningful "action" by the legislature. Instead, we conclude, as did the trial court, that the legislature has been given more than ample time to enact a constitutionally sufficient school funding scheme, and that it has failed to do so. Given this "absence of action," Londonderry I, 154 N.H. at 163, we believe that a judicial remedy beyond declaratory relief "is not only appropriate but essential" at this time, id., especially where, as here, the legislature has never met its constitutional obligation to fully fund an adequate education. See Joy Chia & Sarah A. Seo, Battle of the Branches: The Separation of Powers Doctrine in State Education Funding Suits, 41 Colum. J.L. & Soc. Probs. 125, 142 (2007) (explaining that "a court may consider increasingly aggressive measures" when the state "has responded uncooperatively in the past" to its decisions). We therefore reject the State's argument that the IPD is unconstitutional because it violates the Separation of Powers Clause.

41

[¶117] We close our constitutional separation of powers discussion by observing that the focus of school funding litigation should not be "about which branch of government is stronger, which branch would blink first, or which branch should be the dominant force." DeRolph v. State, 754 N.E.2d 1184, 1203 (Ohio 2001) (Douglas, J., concurring), opinion vacated on reconsideration, 780 N.E.2d 529 (Ohio 2002). It should be "about the proper education and future of [New Hampshire's] public schoolchildren and those generations of children who will follow." Id. In recognition of that fact, this court cautioned 19 years ago that the judiciary's "[d]eference" to the other branches of government "has its limits" when it comes to school funding. Londonderry I, 154 N.H. at 163. We believe that the time has come for the judiciary's deference to give way to its fundamental obligation to provide a meaningful remedy when the State's failure to meet its constitutional obligations affects the rights of our state's children. Accordingly, we would not reverse the IPD on the basis that such relief violates the Separation of Powers Clause.

[¶118] Essentially, the State's argument is that the Separation of Powers Clause unconditionally bars the judiciary from issuing the IPD as a matter of constitutional law. Consistent with Londonderry I, the lead opinion rightfully "reject[s] the proposition that the separation of powers doctrine categorically prohibits the judiciary from awarding injunctive relief like the [IPD]." Because a majority of the court agrees with that conclusion, we believe that addresses the State's argument and should be the end of the IPD discussion.

[¶119] The lead opinion, however, recasts the State's constitutional argument and treats it as a mere "factor" to be considered in the trial court's exercise of its discretion. See Cleaveland, 167 N.H. at 742 (explaining that an injunction will be upheld absent an "error of law" or "an unsustainable exercise of discretion"). The lead opinion then concludes that the IPD must be reversed under the unsustainable exercise of discretion standard because the trial court "failed to properly weigh" and "consider" the separation of powers "factor." We believe that this approach is procedurally improper. We also disagree with the lead opinion's reasoning on the merits.

[¶120] We begin with our procedural concerns. At the trial court level, the State had more than ample opportunity to raise any arguments about the potential remedy in this case. For instance, following remand, the State filed a second motion for summary judgment, a trial memorandum, proposed findings of fact and conclusions of law, and a memorandum of law on separation of powers. In its separation of powers memorandum, the State argued that an injunction remedy would not "comport with this Court's constitutional duty to observe the separation of powers." After the trial court issued its IPD, the State filed a motion for reconsideration and a motion to stay or delay its effective date. In its motion for reconsideration, the State again asserted that the IPD "materially impaired the [legislature's] lawmaking function in a manner that

42

violates the separation of powers and is unconstitutional." At no point in any of these filings did the State suggest that the IPD was improper under the unsustainable exercise of discretion standard or because the trial court improperly balanced the equities.

[¶121] Similarly, the State's challenge to the IPD on appeal rests entirely on constitutional grounds. In the State's opening brief, it frames the "issue presented" as whether the IPD "violates the separation of powers and this Court's education-funding decisions." While the State's brief dedicates an entire section to the trial court's injunction, it makes no mention of the unsustainable exercise of discretion standard, nor does it argue that the trial court miscalibrated "the decisional scales." In its reply brief, the State again raises the separation of powers doctrine as a matter of constitutional law in challenging the IPD, arguing that the plaintiffs did not attempt in their brief "to explain how a single superior court judge is authorized under our constitutional structure to issue a mandatory injunction directing 'the State' to spend—without any approval or oversight—more than half-a-billion unappropriated and unbudgeted dollars annually." (Emphases omitted.)[12]

[¶122] As the foregoing establishes, the State's challenge to the IPD is not and has never been premised on an unsustainable exercise of discretion or an improper balance of the equities. Indeed, based on our review of the State's filings and the remainder of the record, we cannot find a single instance where any arguments relating to an unsustainable exercise of discretion were raised before the trial court or this court. Yet, the lead opinion finds that the IPD should be reversed under this standard.

[¶123] We believe the lead opinion errs "by addressing an [issue] that the parties did not brief on appeal." Hodges v. Johnson, 170 N.H. 470, 490 (2017) (Bassett, J., dissenting). Indeed, this court has a longstanding practice of "confin[ing] [its] review to only those issues that the [appealing party] has fully briefed." State v. Blackmer, 149 N.H. 47, 49 (2003). Accordingly, this court is "generally reluctant to address issues that the parties have neither raised nor briefed." In re J.W., 172 N.H. 332, 344 (2019). The reasoning for this rule has been well-articulated:

> Due process interests are implicated when a court recasts the questions presented and decides a case on issues not discussed by the parties without remanding or providing an opportunity for briefing. [We] believe that it is fundamentally unfair to the parties and their counsel to decide cases on issues where the parties had

---

[12] The fact that this figure is so high only reinforces the trial court's conclusion that the current funding amount is "woefully inadequate" and an egregious violation of the constitutional requirement to fund education.

43

no opportunity to introduce evidence or make their best arguments.

Deciding issues that have not been briefed undermines our adversary process and increases the possibility that we will err. Our adversary process functions most effectively when we rely on the initiative of lawyers, rather than the activism of judges to fashion the questions for review. The adversary system is based on the premise that allowing the parties to address the court on the decisive issue increases the accuracy of the decision. Doing so also increases the parties' sense that the court's process and result are fair.

Hodges, 170 N.H. at 490-91 (quotations, citations, and brackets omitted); see also Stergiou v. City of Dover, 175 N.H. 315, 327 (2022) (Bassett, J., concurring) ("Addressing issues that have not been fully briefed increases the possibility that we will err."). As the dissent concluded in Hodges, we too "believe that it is fundamentally unfair" to decide this important case on grounds that were neither argued nor briefed. Hodges, 170 N.H. at 490; see also United States v. Wagner, 103 F.3d 551, 552 (7th Cir. 1996) (noting it is "not a sound practice" for an appellate court and its staff to raise issues the defendant could have raised but did not); cf. In the Matter of Akin & Suljevic, 174 N.H. 743, 751 (2022) (declining to review trial court's decision for an unsustainable exercise of discretion where appellant did "not argue that the trial court unsustainably exercised its discretion").

[¶124] While this procedural concern is reason enough not to decide this case under an unsustainable exercise of discretion standard, we also disagree with the lead opinion on the merits of that issue. "[W]hether an injunction is appropriate is within the sound discretion of the trial court." Taber v. Town of Westmoreland, 140 N.H. 613, 617 (1996). It follows that this court may reverse an injunction based on an "unsustainable exercise of discretion." Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012). "When we determine whether a ruling made by a judge is a proper exercise of judicial discretion, we are really deciding whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." State v. Lambert, 147 N.H. 295, 296 (2001); see, e.g., Brooks v. Allen, 168 N.H. 707, 711 (2016) (applying same standard of review to award of equitable relief). "The reversal of a discretionary decision under this standard, however, is not a reflection upon the conduct of the trial judge, but rather is an appellate determination that the record fails to disclose an objective basis for a sustainable exercise of discretion." Bianco, P.A. v. Home Ins. Co., 147 N.H. 249, 251 (2001).[13]

---

[13] The lead opinion uses the "unsustainable exercise of discretion" formulation from Lawrence v. Philip Morris USA, 164 N.H. 93, 96 (2012). Lawrence, in turn, adopted it from Petition of Bayview Crematory, 155 N.H. 781, 784 (2007) (Bayview). In both Lawrence and Bayview, the issue before

[¶125] In deciding whether to grant injunctive relief, the trial court was entitled to "consider a wide range of circumstances," Taber, 140 N.H. at 617, and was required to "balanc[e] the equities" presented by them, Frost v. Polhamus, 110 N.H. 491, 494 (1970).

[¶126] Here, the trial court properly considered a variety of facts before issuing the IPD, all of which find support in the record. First, it considered its conclusion that the current amount of statutory base adequacy aid is "woefully" inadequate and unconstitutional, a finding which a majority of this court upholds. Second, it determined that this "egregious underfunding" has resulted in the denial of the fundamental constitutional rights of New Hampshire's school-aged children, which is presumed to cause irreparable harm. See Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) (noting in injunction analysis "the presumption of irreparable injury that flows from a violation of constitutional rights"). Third, as the lead opinion acknowledges, the trial court also considered "the history of school funding litigation" in its calculus. Then, after examining these facts and the extensive trial evidence, the trial court "painstakingly crafted" the necessary remedy, including the CMT and the IPD. We believe this "record establishes an objective basis sufficient to sustain the discretionary judgment made." Lambert, 147 N.H. at 296. We are therefore hard pressed to find any unsustainable exercise of discretion.

[¶127] The lead opinion concludes that the trial court unsustainably exercised its discretion in issuing the IPD because it "did not accord sufficient weight" to the "distinct and heightened separation of powers ramifications" of the IPD "under the unique facts of this case." We disagree. As an initial matter, we can find no authority, and the lead opinion cites none, for the proposition that there are various levels of separation of powers concerns. Moreover, "[o]ur task on appeal is not to reweigh the equities," Malborn Realty Trust, 164 N.H. at 68, nor may this court "substitute [its] judgment for that of the [trial court]" so long as the trial court's injunction "is supported by the evidence," Voedisch v. Town of Wolfeboro, 136 N.H. 91, 93 (1992) (quotation omitted).

[¶128] Those issues aside, we believe that the trial court gave the separation of powers issue significant attention and weight in deciding the appropriate remedy. Indeed, the record reflects that separation of powers concerns were at the forefront of the trial court's analysis at all stages of this litigation, including when it crafted the IPD remedy. For instance, in its order addressing the parties' post-remand cross-motions for summary judgment, the trial court stated:

---

the court concerned class certification. The unsustainable exercise of discretion standard used in those cases was specifically tailored to the criteria that the court must consider in deciding that narrow issue. This court has never used the Lawrence/Bayview unsustainable exercise of discretion description outside of that limited context. We therefore do not use it in our analysis.

45

It is one thing to rule that the current statute under-funds education.  It is quite another to go further and proclaim by how much it is under-funded . . . .  Accordingly, even if the plaintiffs prove that the amount of base adequacy aid set forth in RSA 198:40-a, II(a) is insufficient, they have another mountain to climb after that: they must convince the Court that it has the constitutional authority to 'pick a number' and substitute it for the one passed by the Legislature and enacted by the Governor.

(Emphasis added.)  After it issued this order, the trial court received briefs from the parties that solely addressed the separation of powers issue.  Following trial, the parties filed trial memoranda, each of which extensively discussed separations of powers.  Finally, the trial court's merits order contains an entire section dedicated to "Separation of Powers Considerations," in which it details why it believes that those concerns do not outweigh the need for a meaningful remedy.  To us, this demonstrates that the trial court was well aware of separation of powers concerns and the ramifications its IPD would have.  Given this extensive record, we believe the trial court accorded sufficient weight to the separation of powers issue.

[¶129] Finally, we briefly address the additional basis for reversing the IPD cited in the concurrence.  Specifically, the concurrence reasons that the IPD is a form of injunctive relief and cites the requirement that any award of injunctive relief must be predicated on "proof of the immediate danger of irreparable harm."  The concurrence then concludes that the record is devoid of any evidence regarding irreparable harm and therefore the IPD must be reversed on that basis.  We disagree.

[¶130] As an initial matter, the issue of the sufficiency of the evidence concerning irreparable harm is not properly before us.  It was neither raised in the trial court nor in any of the State's appellate briefs.  In fact, the State has never claimed that the IPD should be reversed due to the perceived absence of irreparable harm.  For the reasons we stated above, we reiterate our belief that it is fundamentally unfair to decide a case on grounds that are not raised by the parties.  Rather, we believe this court should adhere to its longstanding practice of "confin[ing] [its] review to only those issues that the [appealing party] has fully briefed."  Blackmer, 149 N.H. at 49.

[¶131] Even if this issue had been properly raised, we believe that the evidence presented supports the issuance of an injunction under the traditional standard.  The concurrence finds that there has not been any irreparable harm to the school-aged children of this state because "all school districts are spending much more" than the $10,000 per pupil recommended by Baker and Rizzo-Saunders.  The concurrence notes that, in the 2021-2022 school year, "no school district spent less than $14,000 per pupil."  Because the State is failing to meet the constitutional requirement to fully fund

46

education, however, the difference between the total per pupil cost and the amount of state aid generally must be paid for by the school districts themselves. This, in turn, requires local taxpayers to foot the bill for the difference.

[¶132] In other words, the concurrence believes that there has not been any irreparable harm to the children of this state because local taxpayers are providing the funds to adequately educate their children. This reasoning misconstrues the constitutional right at stake. This court has made clear "that the fundamental right at issue is the right to a State funded constitutionally adequate public education." Claremont II, 142 N.H. at 473 (emphasis added). Thus, although local taxpayers may be providing funds that functionally carry out some or all of the State's duty, it does not change the fact that the requirement of a state funded education has not been met.

[¶133] It is well-established that the "deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (quotation omitted); see also Jolly, 76 F.3d at 482. Accordingly, contrary to the concurrence's conclusion, there has undoubtedly been irreparable harm to the school-aged children of this state by virtue of the violation of their fundamental constitutional right to a state funded education. We therefore disagree with the concurrence's contention that New Hampshire public school children will not suffer irreparable harm in the absence of the IPD.

C. Conclusion

[¶134] We conclude that the trial court's remedy — a directive requiring the State to spend the bare minimum on education — was not only proper, but necessary in light of the overwhelming evidence establishing that the current amount of base adequacy aid is "woefully inadequate" coupled with the legislature's longstanding failure to meet its duty to fully fund a constitutionally adequate public education. Because we agree with the trial court's CMT calculations and its use of the CMT in general, we would affirm both the IPD itself and the amount of aid it required.

[¶135] We believe that the proper remedy cannot be to allow the legislature to continue to idle. We fear that the longer the judiciary waits to carry out its constitutional duty to provide a meaningful remedy in school funding cases, the more likely it is that the legislature will continue to ignore its obligation to fund the constitutional right to an adequate education. The legislature will not be deterred from maintaining the status quo when it perceives that the prospect of meaningful judicial relief is unlikely. Simply put, the judiciary can no longer "stand on the sidelines and hope the State meets its constitutional mandate to amply fund education." McCleary, 269 P.3d at 259. To do so would constitute a complete abdication of our constitutional duty "to

ensure that constitutional rights not be hollowed out." <u>Londonderry I</u>, 154 N.H. at 163.

[¶136] We end by noting that "staying the judicial hand in the face of continued violation of constitutional rights makes the courts vulnerable to becoming complicit actors in the deprivation of those rights." <u>State v. Campbell County School Dist.</u>, 32 P.3d 325, 333 (Wyo. 2001) (quotation omitted). We decline to endorse a course of action that exposes the court to that vulnerability, that "perpetuate[s] the egregious underfunding of public education" in this state for the foreseeable future, and that will result in further irreparable harm to the school-aged children of this state. Because we believe the lead opinion's reversal of the trial court's grant of injunctive relief will result in all of those perils, we cannot join it. We therefore respectfully dissent from that holding of the lead opinion.